In the Matter of WORLD ACCESS, INC., Debtor.

Morton Levine, as Trustee of the World Access Realization Liquidation Trust, Plaintiff.

v.

Telco Systems, Inc., Defendant.

Bankruptcy No. 01 B 14633.
Adversary No. 02 A 01739.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

April 22, 2005.

J. Michael Lamberth, Atlanta, GA, for Debtor.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary proceeding relates to the Chapter 11 bankruptcy case of World Access Inc. ("World Access" or "Debtor"). The Plaintiff Trustee for the World Access Liquidation Trust seeks to recover state tax refunds received by its former affiliate, Telco Systems Inc. ("Telco" or "Defendant"), contending that they are property of the estate. Telco claims ownership of the refunds, but did not argue that claim or show a legal or contractual basis for it. In the alternative, it asserts a right of setoff and recoupment based on contractual provisions and claims.

Following trial, the Court now makes and enters the following Findings of Fact and Conclusions of Law. For reasons discussed below, judgment will separately be entered for the Plaintiff. In essence, World Access filed returns and paid state taxes on behalf of Telco as it contracted to do so, overpaid such taxes, and wants the refunds that were sent by the state taxing authorities to Telco. Telco has no nor any right to offset or recoup its own claims against those funds or right to those refunds, and must disgorge them.

### BACKGROUND AND PROCEDURAL HISTORY

On September 21, 2004 an Order was entered in World Access' jointly administered bankruptcy case (jointly administered with cases of related companies) confirming a Plan of liquidation. The Plan, effective October 12, 2004, established a Liquidation Realization Trust to liquidate the assets and property of World Access. The Plan designated Morton Levine of Levine & Block in Atlanta, Georgia to serve as the initial Realization Trustee. (Def.'s Ex. 7, § 7.1.) This Adversary was filed preconfirmation by Debtor, but an order was entered herein substituting Morton Levine, as Trustee of the World Access Realization Liquidation Trust, as plaintiff in place of World Access, Inc. (Realization Trustee's Substitution Order, Oct. 19, 2004.) Pursuant to the confirmed Plan, the present Plaintiff is authorized to prosecute this litigation.

The Adversary went to trial on the Amended Complaint, which recites three theories, actually separate counts although not so named. Count I alleges that the tax refunds were property of the estate and requests judgment ordering turnover under 11 U.S.C. § 542. Count II pleads that Telco's receipt of the refunds constituted postpetition transfers due to be returned under 11 U.S.C. §§ 549, 550. Count III alleges that Telco's receipt and use of the tax refunds constituted a conversion of its property.

Telco answered, raising affirmative defenses claiming its ownership rights in the tax refunds; a right of setoff and recoupment; a contractual right of indemnification based on a Stock Purchase Agreement; failure to state a claim; and its right to recover a tax refund received from the State of Massachusetts by it but then paid over by "mistake" to World Access. (Answ. ¶¶ 28–32.)

Telco also asserted a counterclaim seeking the imposition of a constructive trust (Answ. ¶¶ 33–44), but voluntarily dismissed that counterclaim with prejudice. (Order

Dismissing Telco's Counterclaim, September 24, 2004.)

The Adversary proceeding was tried, evidence taken, the parties rested. The Court now makes and enters the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

Most materials facts were not disputed, and indeed were stipulated to or admitted in proposed Findings of Fact and Conclusions of Law filed by the parties or by Debtor in its Disclosure Statement.

1. World Access, Inc. ("World Access" or "Debtor") is a Delaware corporation with its principal place of business in Atlanta, Georgia.

2. World Access and several related entities filed a Chapter 11 bankruptcy proceeding in this Court. The World Access bankruptcy case and those of the related entities are being jointly administered under Case No. 01 B 14633. (Stip. ¶ 1.)[1]

3. Prior to filing its petition for relief, World Access manufactured and resold telecommunications equipment. In December of 1998, it reorganized into two separate groups: a Telecommunications Group that provided, among other things, wholesale international long distance service via a combination of its own international network facilities and resale relationships with other long distance service providers; and an Equipment Group that provided, among other things, digital switches, billing and telemanagement systems, and other telecommunications products.

4. Telco Systems, Inc. ("Telco" or "Defendant") was the largest entity in the Equipment Group. (Am. Compl. ¶ 7; Answ. ¶ 7.)

5. Telco is a Delaware corporation with its principal place of business in Foxboro, Massachusetts. It provides telecommunications equipment to telephone service providers and end users. (Garrity Tr. at 99.)[2]

6. In 1999, World Access adopted a plan to divest itself of the Equipment Group, including Telco. (Pl.'s Post–Trial Findings of Fact ¶ 1; Def.'s Post–Trial Findings of Fact ¶ 1.) World Access entered into discussions with an Israeli technology company, BATM Advanced Communications Limited ("BATM"), regarding a potential sale of Telco.

### Drafting and Execution of the Stock Purchase Agreement

7. On January 19, 2000, Mr. Robert W. Cleveland, an attorney for BATM, sent a facsimile transmission to Mr. G. Scott Rafshoon, an attorney for World Access (the "Cleveland 1/19/00 Facsimile"). (Stip. ¶ 121; Pl.'s Ex. 24.) The Cleveland 1/19/00 Facsimile provided comments from BATM's counsel to World Access's counsel on a draft stock purchase agreement whereby BATM would purchase all the outstanding stock of Telco. (Stip. ¶ 122.)

8. Section 8.9, entitled "Tax Indemnification" and included in the Cleveland January 19, 2000 Facsimile as Rider 21 A, was drafted by counsel for BATM. (Stip. ¶ 123.)

9. Most of the substance of Section 8.9, entitled "Tax Indemnification" and included in the Cleveland 1/19/00 Facsimile as Rider 21A, after certain modifications resulting from further negotiations between BATM and World Access, became Section 9.8 of the Stock Purchase Agreement when executed. (Stip. ¶ 124.)

---

1. Stipulated facts found in the Stipulation of Facts filed by the parties are referred to as "Stip."

2. "Tr." refers to the trial transcript dated October 25, 2004 and pages of the witness referred to.

10. On or about February 2, 2000, World Access and BATM executed the Stock Purchase Agreement ("SPA"). World Access agreed to sell Telco for $260.8 million in cash and 960,000 shares of BATM stock, which had a value as of closing of $85.482 million. BATM also agreed to purchase all of the issued and outstanding capital stock of Telco and assume approximately $25.692 million in debts. (Stip. ¶ 2; Am. Compl.¶ 9; Answ. ¶ 9; Pl.'s Ex. 1.)

11. World Access and BATM closed the sale of Telco on April 7, 2000 ("Closing Date"). (Stip. ¶ 3.)

12. The SPA refers to World Access as the "Seller," to BATM as the "Buyer," and to Telco as the "Company." (Stip. ¶ 127; Pl.'s Ex. 1.)

13. Telco was not a signatory to the SPA. (Stip.¶ 127.)

### World Access' Obligations to Telco Under the Stock Purchase Agreement

14. Under terms of the SPA, World Access and BATM agreed to make a joint Internal Revenue Code Election under § 338(h)(10) of the Internal Revenue Code to treat the stock sale as a deeded asset sale for tax purposes. (Compl. ¶ 11; Anws. ¶ 11; Stip. ¶ 4; Pl's Ex. 1, § 9.38(i).)

15. The SPA required that income taxes for the period up to and including the Closing would be determined on the basis of an interim closing of the books as of the end of the Closing Date, and it specified a formula for any taxes not based on income. (Pl.'s Ex. 1, § 9.8(c)(ii); Stip. ¶ 7.)

16. World Access and BATM agreed to allocate responsibility for the payment of such tax liability of Telco. (Pl's Ex. 1, § 9.8(c)(i).)

17. World Access was to be responsible for the filing of tax returns, extension payments and payment of tax liability for Telco's taxes attributable to periods ending on or before the Closing Date. (Stip. ¶¶ 6, 9;

Pl's Findings of Fact ¶ 3; Def.'s Findings of Fact ¶ 3; Pl.'s Ex. 1, § 9.8(d)(i).) This period was from January 1, 2000 through April 7, 2000 ("Stub Period"). (Stip. ¶¶ 14, 22, 45, 53, 72, 80.)

18. BATM was responsible for the filing of tax returns, extension payments, and payment of tax liability for Telco's taxes attributable to periods beginning after the Closing Date. (Stip. ¶ 6; Pl.'s Ex. 1, § 9.8(d)(i).)

19. World Access also agreed to indemnify, defend, and hold harmless BATM and Telco from specified tax claims, deficiencies, demands, or assessments, including defense or settlement costs, and attorneys fees arising before the Closing Date. (Pl.'s Ex. 1, § 9.8(a).)

### Extension Payments

20. Under the SPA, World Access was to file tax forms on Telco's behalf requesting an extension of the deadlines for filing Telco's tax returns for the Stub Period. World Access filed such extension requests with taxing authorities in the states of Georgia, Pennsylvania, Massachusetts, and New Jersey. (Stip. ¶¶ 17, 43, 70, 103.)

21. World Access also submitted a series of extension payments to satisfy Telco's pre-closing tax liability to taxing authorities of the states of Georgia, Pennsylvania, Massachusetts, and New Jersey. (Stip. ¶¶ 14, 22, 45, 53, 72, 80, and 105.)

22. World Access submitted the extension requests and extension payments after the Closing date. (Stip. ¶¶ 15,16, 73, 74, 106, and 107.)

### Georgia Extension Payments

23. On or about June 22, 2000, World Access submitted Georgia Form IT–560–C (requesting an extension of the time for filing Telco's tax return for the income tax year ending April 10, 2000) to the Georgia Income Tax Division of the Georgia De-

partment of Revenue. (Stip. ¶ 17; Pl.'s Ex. 3.)

24. On or about June 22, World Access issued and submitted its check number 32729, ("Georgia Extension Check") payable to the Georgia Income Tax Division in the amount of $746,000. (Stip. ¶¶ 10, 12; Pl.'s Ex. 2.)

25. World Access submitted the Georgia Extension Check to the Georgia Department of Revenue after the Closing Date. (Stip. ¶ 15.)

26. World Access paid the Georgia Extension Check after the Closing Date. (Stip. ¶ 16.)

27. As a result of the Georgia Extension Check, Telco's Georgia tax return for the taxable period January 1, 2000 through April 7, 2000 was not due until September of 2001. (Stip. ¶ 17.)

### Pennsylvania Extension Payments

28. On or about August 14, 2000, World Access submitted a Pennsylvania REV–853R Annual Extension Request for Telco for taxable period ending April 10, 2000 to the Pennsylvania Department of Revenue. (Stip. ¶ 43; Pl.'s Ex. 10.)

29. Pennsylvania Form REV–853R reflected a "Total Payment" of $53,000. (Stip. ¶ 44; Pl.'s Ex. 10.)

30. On August 14, 2000, World Access issued its check number 33104, ("Pennsylvania Extension Check") payable to the "PA Dept of Revenue" in the amount of $53,000. (Stip. ¶ 41; Pl.'s Ex. 9.)

31. The Pennsylvania extension check was a payment made by World Access in connection with Telco's Pennsylvania tax return for the taxable period January 1, 2000 through April 7, 2000. (Stip. ¶ 45.)

32. World Access submitted the Pennsylvania Extension Check to the Pennsylvania Department of Revenue after the Closing Date. (Stip. ¶ 46.)

33. World Access paid the Pennsylvania Extension Check after the Closing Date. (Stip. ¶ 47.)

34. As a result of the Pennsylvania Extension Check and the REV–853R, Telco's Pennsylvania tax return for the taxable period January 1, 2000 through April 7, 2000 was not due until September of 2001. (Stip. ¶ 48.)

### Massachusetts Extension Payments

35. On or about July 22, 2000, World Access submitted a Massachusetts Form 355–7004 requesting an extension of time to file Telco's Massachusetts Domestic or Foreign Business/Manufacturing or Security Corporation Excise Return for taxable year beginning January 1, 2000 and ending April 10, 2000 to the Massachusetts Department of Revenue. (Stip. ¶ 70; Pl.'s Ex. 15.)

36. Massachusetts Form 355–7004 reflected a "Balance due with the application" of $7,007,000. (Pl.'s Ex. 15; Stip. ¶ 71.)

37. On July 22, 2000, World Access submitted an extension check payable to the "Massachusetts Dept of Revenue" in the amount of $7,007,000. ("Massachusetts Extension Check") to the Massachusetts Department of Revenue. (Stip. ¶ 68; Pl.'s Ex. 14.)

38. The Massachusetts Extension Check was a payment made by World Access in connection with Telco's Massachusetts tax return for the taxable period January 1, 2000 through April 7, 2000. (Stip. ¶ 72.)

39. World Access submitted the Massachusetts Extension Check to the Massachusetts Department of Revenue after the Closing Date. (Stip. ¶ 73.)

40. World Access paid the Massachusetts Extension Check after the Closing Date. (Stip. ¶ 74.)

41. As a result of the Massachusetts Extension Check and the Form 355–7004, Telco's Massachusetts tax return for the taxable period January 1, 2000 through April 7, 2000 was not due until September of 2001. (Stip. ¶ 75.)

*New Jersey Extension Payments*

42. On or about August 14, 2000, World Access submitted a State of New Jersey Tentative Return and Application for Extension of Time to File for Telco for accounting period beginning January 1, 2000 and ending April 10, 2000 (the "Extension Application") to the New Jersey Division of Taxation. (Stip. ¶ 103; Pl.'s Ex. 21.)

43. The Extension Application reflected a "Net Balance Remitted Herewith" of $300. (Pl.'s Ex. 21; Stip. ¶ 104.)

44. On August 14, 2000, World Access issued and submitted check number 33103, payable to the "State of New Jersey" in the amount of $300 (the "New Jersey Extension Check") to the New Jersey Division of Taxation. (Stip. ¶ 101.1; Pl.'s Ex. 20.)

45. The New Jersey Extension Check was a payment made by World Access in connection with Telco's New Jersey tax return for the taxable period January 1, 2000 through April 7, 2000. (Stip. ¶ 105.)

46. World Access submitted the New Jersey Extension Check to the New Jersey Income Tax Division after the Closing Date. (Stip. ¶ 106.)

47. World Access paid the New Jersey Extension Check after the Closing Date. (Stip. ¶ 107.)

48. As a result of the New Jersey Extension Check and the Extension Application, Telco's New Jersey tax return for the taxable period January 1, 2000 through April 7, 2000 was not due until September of 2001. (Stip. ¶ 108.)

*Estimated Tax Payments*

49. As required by the SPA, in 2000 and 2001, World Access filed estimated tax forms and submitted a series of estimated tax payments to satisfy Telco's pre-closing tax liability to the taxing authorities of the states of Georgia, Pennsylvania, and Massachusetts. (Stip. ¶¶ 14, 22, 45, 53, 72, 80, and 105.)

*Georgia Estimated Tax Payment*

50. On or about March 15, 2001, World Access submitted a Georgia Corporate Estimated Tax Form 602ES for Telco for the taxable period beginning January 1, 2000 and ending April 7, 2000 to the Georgia Department of Revenue. (Stip. ¶ 20; Pl.'s Ex. 5.)

51. Georgia Form 602ES reflected an "Amount Due" of $6,000. (Stip. ¶ 21; Pl.'s Ex. 5.)

52. On March 15, 2001, World Access issued its check number 34137 payable to the "Georgia Income Tax Division" in the amount of $6,000 (the "Georgia Estimated Payment Check"). (Stip. ¶ 18; Pl.'s Ex. 4.)

53. On or about March 15, 2001, World Access submitted the Georgia Estimated Payment Check to the Georgia Department of Revenue. (Stip. ¶ 19.)

54. The Georgia Estimated Payment Check was a payment made by World Access in connection with Telco's Georgia tax return for the taxable period January 1, 2000 through April 7, 2000. (Stip. ¶ 22.)

55. World Access submitted the Georgia Estimated Payment to the Georgia Department of Revenue after the Closing Date. (Stip. ¶ 23.)

56. World Access paid the Georgia Estimated Payment Check after the Closing Date. (Stip. ¶ 24.)

57. The amount of the Georgia Extension Check (Findings Nos. 24–26) and the Georgia Estimated Payment Check were $746,000 and $6,000 respectively, totaling $752,000. (Stip. ¶ 25.)

### Pennsylvania Estimated Tax Payment

58. On or about March 15, 2001, World Access submitted a Pennsylvania REV–857R Estimated Tax Payment for Telco for the taxable period ending April 7, 2000 to the Pennsylvania Department of Revenue. (Stip. ¶ 51.)

59. Pennsylvania Form REV–857R reflected a "Total Payment" of $107,898. (Pl.'s Ex. 12; Stip. ¶ 52.)

60. On March 15, 2001, World Access issued check number 034180, payable to the "PA Dept of Revenue" in the amount of $107,898 (the "Pennsylvania Estimated Payment Check"). (Pl.'s Ex. 11; Stip. ¶ 49.)

61. On or about March 15, 2001 World Access submitted the Pennsylvania Estimated Payment Check to the Pennsylvania Department of Revenue. (Stip. ¶ 50.)

62. The Pennsylvania Estimated Payment Check was a payment made by World Access in connection with Telco's Pennsylvania tax return for the taxable period January 1, 2000 through April 7, 2000. (Stip. ¶ 53.)

63. World Access submitted the Pennsylvania Estimated Payment Check to the Pennsylvania Department of Revenue after the Closing Date. (Stip. ¶ 54.)

64. World Access paid the Pennsylvania Estimated Payment Check after the Closing Date. (Stip. ¶ 55.)

65. The amounts of the Pennsylvania Extension Check (Findings Nos. 30–33) and the Pennsylvania Estimated Payment Check ($53,000 plus $107,898, respectively) totaled $160,898. (Stip. ¶ 56.)

### Massachusetts Estimated Tax Payment

66. On or about March 15, 2001, World Access submitted a Massachusetts Form 355–ES for Telco to the Massachusetts Department of Revenue. (Stip. ¶ 78.)

67. Massachusetts Form 355–ES reflected an "Amount due with this install-ment" of $3,100,000. (Pl.'s Ex. 17; Stip. ¶ 79.)

68. On March 15, 2001, World Access issued its check number 34139, payable to the "Commonwealth of Massachusetts" in the amount of $3,100,000 ("Massachusetts Estimated Payment Check"). (Stip. ¶ 76; Pl.'s Ex. 16.)

69. On or about March 15, 2001, World Access submitted the Massachusetts Estimated Payment Check to the Massachusetts Department of Revenue. (Stip. ¶ 77.)

70. The Massachusetts Estimated Payment Check was a payment made by World Access in connection with Telco's Massachusetts tax return for the taxable period January 1, 2000 through April 7, 2000. (Stip. ¶ 80.)

71. World Access submitted the Massachusetts Estimated Payment Check to the Massachusetts Department of Revenue after the Closing Date. (Stip. ¶ 81.)

72. World Access paid the Massachusetts Estimated Payment Check after the Closing Date. (Stip. ¶ 82.)

73. The amounts of the Massachusetts Extension Check (Findings Nos. 37–39) and the Massachusetts Estimated Payment Check were $7,007,000 and $3,100,000 respectively, totaling $10,107,000. (Stip. ¶ 83.)

### Filing of Tax Returns

74. After making the extension and estimated tax payments, World Access filed its Chapter 11 bankruptcy case on April 24, 2001, jointly administered here with related companies.

75. By Court order dated August 2, 2001, World Access employed Ernst & Young ("EY") as accountants in its bankruptcy case as World Access's accountants. (Order Authorizing the Employment and Retention of Ernst & Young, LLP as Ac-

countants, August 2, 2001; Mies Tr. at 36, 37.)

76. EY prepared tax returns for Telco for the Stub Period in the states Georgia, Pennsylvania, Massachusetts and New Jersey to be filed in September of 2001. (Stip. ¶¶ 17, 26, 48, 57, 75, 84, 108, and 109.) After EY prepared the tax returns, Telco signed and filed them with the appropriate state taxing authorities. (Stip. ¶¶ 26.1, 27, 57.1, 58, 84.1, 85, 109.1, and 110; Pl.'s Ex. 6, 13, 18, and 22.)

77. On September 27, 2000, Mr. David Garrity, Telco's Vice President of Finance wrote a letter to Mr. Michael Mies, World Access' Senior Vice President of Finance regarding "Telco Systems, Inc. State Income Tax Returns for Tax Periods Ending 8/98, 11/98 & 12/98". (Stip. ¶ 125; Pl.'s Ex. 25.) In this letter Mr. Garrity provided a list reflecting Telco's remaining tax returns to be filed. Mr. Mies testified at trial that he did not recall having received or having responded to the Garrity letter, and that he did not know whether all such tax returns had been filed. (Mies Tr. at 86.)

### Georgia Tax Returns 2000 Tax Return

78. EY prepared a Georgia Corporation Tax Return Form 600 for Telco for the taxable period January 1, 2000 through April 7, 2000 (the "Georgia 2000 Stub Return"). (Stip. ¶ 26; Pl.'s Ex. 6.)

79. Telco signed and filed the Georgia 2000 Stub Return with the Georgia Department of Revenue. (Stip. ¶ 27.)

80. Schedule 3, line 1, of the Georgia 2000 Stub Return reflected "Total. Tax" of $61,073. (Stip. ¶ 28; Pl.'s Ex. 6.)

81. Schedule 3, line 2, of the Georgia 2000 Stub Return reflected "Less: Credits and payments of estimated tax" of $765,635. (Stip. ¶ 29; Pl.'s Ex. 6.)

82. Schedule 3, line 5, of the Georgia 2000 Stub Return reflected an "Amount of overpayment" of $704,562. (Stip. ¶ 30; Pl.'s Ex. 6.)

83. Schedule 3, line 6, of the Georgia 2000 Stub Return reflected "Interest due" of $1,847. (Stip. ¶ 31; Pl.'s Ex. 6.)

84. Schedule 3, line 7, of the Georgia 2000 Stub Return reflected "Penalties due" of $916. (Stip. ¶ 32; Pl.'s Ex. 6.)

85. Schedule 3, line 9, of the Georgia 2000 Stub Return reflected an amount "Refunded" of $701,799. (Stip. ¶ 33; Pl.'s Ex. 6.)

### 1999 Tax Return

86. On or about September 15, 2000, World Access signed and filed a Georgia Corporation Tax Return Form 600 for Telco for the taxable period January 1, 1999 through December 31, 1999 (the "Georgia 1999 Return"). (Stip. ¶ 34; Pl.'s Ex. 7.)

87. The Georgia 1999 Return reflected an "Amount of Line 6 to be credited to 2000 estimated tax" of $13,635. (Stip. ¶ 35; Pl.'s Ex. 7.)

88. The "Credits and payments of estimated tax" of $765,635 reflected on the Georgia 2000 Stub Return consisted of the payments from the Georgia Extension Check and the Georgia Estimated Payment Check of $752,000, plus the credit from the Georgia 1999 Return of $13,635. (Stip. ¶ 36; Pl.'s Ex. 7.)

### Pennsylvania Tax Return

89. EY prepared a Pennsylvania Corporate Tax Report 2000 RCT–101 for Telco for the tax period beginning January 1, 2000, and ending April 7, 2000 ("Pennsylvania 2000 Stub Return"). (Stip. ¶ 57; Pl.'s Ex. 13.)

90. Telco signed and filed the Pennsylvania 2000 Stub Return with the Pennsylvania Department of Revenue. (Stip. ¶ 58.)

91. The Pennsylvania 2000 Stub Return, in Step D, reflected a total "Tax

Liability from Tax Report" of $63,700. (Stip. ¶ 59; Pl.'s Ex. 13.)

92. The Pennsylvania 2000 Stub Return, in Step D, reflected a total "Estimated Payments and Credits on Deposit for the Current Period" of $160,898. (Stip. ¶ 60; Pl.'s Ex. 13.)

93. The Pennsylvania 2000 Stub Return, in Step D, reflected a total difference between "Tax Liability from Tax. Report" and "Estimated Payments and Credits on Deposit for the Current Period" of $97,198. (Stip. ¶ 61; Pl.'s Ex. 13.)

94. Box C in Step F of the Pennsylvania 2000 Stub Return was marked which provided "Refund the overpayment from the current tax period after paying any current tax period underpaid taxes." (Stip. ¶ 62; Pl.'s Ex. 13.)

### Massachusetts Tax Return

95. EY prepared a Massachusetts Form 355C–B Foreign Business or Manufacturing Corporation Excise Return for Telco for the taxable period beginning January 1, 2000 and ending April 7, 2000 ("Massachusetts 2000 Stub Return"). (Stip. ¶ 84; Pl.'s Ex. 18.)

96. Telco signed and filed the Massachusetts 2000 Stub Return with the Massachusetts Department of Revenue by the Defendant. (Stip. ¶ 85.)

97. Line 19 on page 1 of the Massachusetts 2000 Stub Return reflected "Excise due plus voluntary contribution and recapture" of $9,371,297. (Stip. ¶ 86; Pl.'s Ex. 18.)

98. Line 20 on page 1 of the Massachusetts 2000 Stub Return reflected "1999 overpayment applied to your 2000 estimated tax" of $693,851. (Stip. ¶ 87; Pl.'s Ex. 18.)

99. However, that entry on Line 20 of page 1 of the Massachusetts 2000 Stub Return was an error and should have been $0. (Stip. ¶ 88; Pl.'s Ex. 18.)

100. Line 21 on page 1 of the Massachusetts 2000 Stub Return reflected "2000 Massachusetts estimated tax payments (do not include amount in line 20)" of $7,007,000. (Stip. ¶ 89; Pl.'s Ex. 18.)

101. Line 22 on page 1 of the Massachusetts 2000 Stub Return reflected "Payment made with extension" of $3,100,000. (Stip. ¶ 90; Pl.'s Ex. 18.)

102. Line 23 on page 1 of the Massachusetts 2000 Stub Return reflected "Amount Overpaid" of $1,429,554. (Stip. ¶ 91; Pl.'s Ex. 18.)

103. Line 25 on page 1 of the Massachusetts 2000 Stub Return reflected "Amount overpaid to be refunded" of $1,429,554. (Stip. ¶ 92; Pl.'s Ex. 18.)

### New Jersey Return

104. EY prepared a New Jersey Corporation Business Tax Return for Telco for the taxable year beginning January 1, 2000 and ending April 7, 2000 ("New Jersey 2000 Stub Return"). (Stip. ¶ 109; Pl.'s Ex. 22.)

105. Telco signed and filed the New Jersey 2000 Stub Return with the New Jersey Division of Taxation. (Stip. ¶ 110.)

106. Line 13 on page 1 of the New Jersey 2000 Stub Return reflected "Total Tax Liability" of $1,736. (Stip. ¶ 111; Pl.'s Ex. 22.)

107. Line 16 on page 1 of the New Jersey 2000 Stub Return reflected "Payments & Credits" of $4,093. (Stip. ¶ 112; Pl.'s Ex. 22.)

108. Line 22 on page 1 of the New Jersey 2000 Stub Return reflected an "overpayment" of $2,317. (Stip. ¶ 113; Pl.'s Ex. 22.)

109. Line 23 on page 1 of the New Jersey 2000 Stub Return reflected an "Amount of Item 22 to be Refunded" of $2,317. (Stip. ¶ 114; Pl.'s Ex. 22.)

### Receipt of Refunds

110. After filing the state tax returns, Telco received a series of refunds in 2002 from Georgia, Pennsylvania, Massachusetts and New Jersey, all attributable to the Stub Period (Findings No. 17) and totaling $1,290,585.83 ("tax refunds"). Those refunds all represented overpayments by World Access of taxes it paid on behalf of Telco.

111. Telco also received a $682,495 1999 tax refund check from the state of Massachusetts. That refund also represented an overpayment by World Access of tax it paid on behalf of Telco.

### Georgia Tax Refund

112. After the Closing Date, Telco received check number 0204020061285, dated February 9, 2002, from the "Georgia Department of Revenue" in the amount of $701,799 (the "Georgia 2000 Stub Refund"). (Stip. ¶ 37; Pl.'s Ex. 8.)

113. The Georgia Department of Revenue issued the Georgia 2000 Stub Refund in connection with Telco's taxable period of January 1, 2000 through April 7, 2000. (Stip. ¶ 38.)

114. Telco deposited the Georgia 2000 Stub Refund in its account. (Stip. ¶ 39.)

115. Telco has not turned over the Georgia 2000 Stub Refund, or proceeds equaling the Georgia 2000 Stub Refund, to World Access. (Stip. ¶ 40.)

116. The payments that gave rise to the $701,779 Georgia 2000 Refund were paid by World Access to the Georgia Department of Revenue, Georgia Income Tax Division after the Closing Date. (Stip. ¶ 40.1.)

### Pennsylvania Tax Refund

117. After the Closing Date, Telco received a check from the Pennsylvania Department of Revenue in the amount of $75,112 (the "Pennsylvania 2000 Stub Refund"). (Stip. ¶ 63; Pl.'s Ex. 13A.)

118. The Pennsylvania Department of Revenue issued the Pennsylvania 2000 Stub Refund in connection with Telco's taxable period of January 1, 2000 through April 7, 2000. (Stip. ¶ 64.)

119. Telco deposited the Pennsylvania 2000 Stub Refund in its account. (Stip. ¶ 65.)

120. The difference between amount of the Pennsylvania 2000 Stub Refund received by Telco ($75,112) and the amount reflected as the refund on the Pennsylvania 2000 Stub Return ($97,198) is $22,086. This difference is the result of transfers made at the Pennsylvania Department of Revenue's discretion to cover asserted future Telco tax liabilities: $4,252 for asserted 2001 liabilities not paid by the Telco and $17,834 for asserted 2002 liabilities not paid by Telco. (Stip. ¶ 66.)

121. Telco has not turned over the Pennsylvania 2000 Stub Refund, or proceeds equaling the Pennsylvania 2000 Stub Refund, to World Access. (Stip. ¶ 67.)

122. The payments that gave rise to the $75,112 Pennsylvania 2000 Stub Refund were paid by World Access to the Pennsylvania Department of Revenue after the Closing Date. (Stip. ¶ 67.1.)

### Massachusetts Tax Refund

123. After the Closing Date, the Defendant received check number 20606105, dated January 23, 2002, from the "Commonwealth of Massachusetts Department of Revenue" in the amount of $511,285.91 ("Massachusetts 2000 Stub Refund"). (Stip. ¶ 93; Pl.'s Ex. 19.)

124. The Massachusetts Department of Revenue issued the Massachusetts 2000 Stub Refund in connection with Telco's taxable period of January 1, 2000 through April 7, 2000. (Stip. ¶ 94; Pl.'s Ex. 19.)

125. The difference between the amount of the Massachusetts 2000 Stub Refund received by Telco ($511,285.91) and

the amount reflected as the refund on the Massachusetts 2000 Stub Return ($1,429,-554) is $918,268.09. This difference is the result of the 1999 overpayment which was reflected in error on the Massachusetts 2000 Stub Return of $693,851, plus penalties assessed by the Massachusetts Department of Revenue of $70,915.23, plus interest assessed by the Massachusetts Department of Revenue of $153,501.86. (Stip. ¶ 95.)

126. Telco deposited the Massachusetts 2000 Stub Refund in its account. (Stip. ¶ 96.)

127. Telco has not turned over the Massachusetts 2000 Stub Refund, or proceeds equaling the Massachusetts 2000 Stub Refund, to World Access. (Stip. ¶ 97.)

128. The payments that gave rise to the $511,285.91 Massachusetts 2000 Stub Refund were paid to the Massachusetts Department of Revenue by World Access after the Closing Date. (Stip. ¶ 99.1.)

### Massachusetts 1999 Tax Refund

129. After the Closing Date, Telco received check number 20503194, dated October 18, 2000, from the "Massachusetts Department of Revenue" in the amount of $682,495 ("Massachusetts 1999 Tax Refund"). (Stip. ¶ 98; Pl.' Ex. 28.)

130. Telco originally deposited the Massachusetts 1999 Refund in its account. (Stip. ¶ 99.)

131. However, on October 26, 2000, Telco wired to World Access the amount of the Massachusetts 1999 Tax Refund, or $682,495. (Stip. ¶ 100.)

132. Telco wired the amount of the Massachusetts 1999 Tax Refund to World Access after Telco's Vice President of Finance David Garrity conferred with Mr. Alan Lury (formerly Telco's Director of Treasury and Tax), and with Mr. Mark Gergel ("Gergel", Chief Financial Officer of World Access). (Stip. ¶ 138.)

### New Jersey Tax Refund

133. After the Closing Date, Telco received a check dated June of 2002, from the State of New Jersey in the amount of $2,388.92 (the "New Jersey 2000 Stub Refund"). (Stip. ¶ 100; Pl.'s Ex. 23.)

134. The New Jersey 2000 Stub Refund was issued in connection with Telco's taxable period of January 1, 2000 through April 7, 2000. (Stip. ¶ 116.)

135. The difference between the amount of the New Jersey 2000 Stub Refund received by Telco ($2,388.92) and the amount reflected as the refund on the New Jersey 2000 Stub Return ($2,317) is $71.92, which represents interest paid by the State of New Jersey. (Stip. ¶ 117.)

136. Telco deposited the New Jersey 2000 Stub Refund in its account. (Stip. ¶ 118.)

137. Telco has not turned over the New Jersey 2000 Stub Refund, or proceeds equaling the New Jersey 2000 Stub Refund, to World Access. (Stip. ¶ 119.)

138. Plaintiffs Exhibit 23A is a summary of the payments made by World Access after the Closing Date totaling $11,020,198. These payments gave rise to the refunds sought by World Access in this Adversary. (Stip. ¶ 120; Pl.'s Ex. 23A.)

139. All the tax refunds in the total sum of $1,973,080.83–comprised of the (a) $701,799 Georgia 2000 Stub Refund, (b) the $75,112 Pennsylvania 2000 Stub Refund, (c) $511,285.91 Massachusetts 2000 Stub Refund, (d) $682,495 Massachusetts 1999 Refund, and (e) $2,388.92 New Jersey 2000 Stub Refund—were made payable to the order of "TELCO SYSTEMS INC."

140. World Access first became aware of the tax refunds after EY's preparation of the state tax refunds in late August or early September of 2001. (Mies Tr. at 36–37.)

141. Telco never expressly agreed to reimburse World Access for any of the tax refunds issued to Telco and presently sought by World Access. (Garrity Tr at 100; Pl.'s Findings of Fact ¶ 13; Def.'s Findings of Fact ¶ 9.) Further, Telco had no involvement in calculating the estimated payments and extension payments. Telco also had no involvement in preparing the tax returns, other than to provide revenue and expense information to EY. (Garrity Tr at 117–118.)

142. World Access's executive offices are in Atlanta, Georgia. (Mies Tr. at 27.) The extension and estimated checks all display World Access's Atlanta, Georgia address. (Pl.'s Ex. 2, 4, 9, 11, 14, 16, and 20.) Moreover, the decision to issue the tax payments which generated the Tax Refunds were made at World Access's executive offices. (Mies Tr. at 31–32.) Over half of the tax refunds at issue were paid from the Georgia Department of Revenue from a Bank of America account located in Atlanta, Georgia. (Pl.'s Ex. 8.)

143. Sometime after the Closing Date, Telco contacted the state taxing authorities and changed its address from World Access' headquarters in Atlanta to Telco's Delaware, Massachusetts address. Telco received the tax refunds at its Massachusetts address. (Garrity Tr. at 130.)

144. Schedule B filed by World Access in its Chapter 11 case on June 25, 2001, does not identify as an asset of World Access any claim against Telco or any other tax refunds to which the complaint refers in this proceeding. (Stip. ¶ 129.)

*Post–Closing Tax Payments and Assessments Paid by Telco*

145. After the Closing Date, Telco paid certain taxes and related interest and penalties assessed by the taxing authorities in Florida, New York, Texas, and the United States for taxable periods ending on or before the Closing Date, in the sum of $417,882.35. (Stip. ¶ 131.)

146. After the filing of the Pennsylvania 2000 Stub Return, the Pennsylvania Department of Revenue assessed additional taxes against Telco for the tax period ending April 7, 2000 (the "Pennsylvania 2000 Stub Period Assessment"). (Stip. ¶ 132.)

147. Telco did not appeal from the Pennsylvania Stub Period Assessment. (Stip. ¶ 133.)

148. As of August 20, 2004, the Pennsylvania 2000 Stub Period Assessment, together with related penalties and interest, amounted to $49,850 (Stip. ¶ 134.)

149. Telco paid Texas franchise tax and related penalties and interest for the tax year ending December 31, 2000, in the sum of $159,411.79. All such franchise tax was attributable to income earned by Telco during the period beginning January 1, 2000, and ending at the close of business on the Closing Date. (Stip. ¶ 135.) Defendant's Exhibit 1 is a summary of the foregoing payments and assessments in the total sum of $627,144.14. (Stip. ¶ 136; Def.'s Ex. 1.)

*Attorneys Fees Incurred by Telco*

150. The SPA provides that World Access will indemnify, defend, and hold harmless BATM and Telco from specified tax claims, deficiencies, demands, or assessments, including defense or settlement costs, and attorneys fees arising before the Closing Date. (Pl.'s Ex. 1, § 9.8; Disclosure Statement § 2.22.) Telco contends that this provision requires World Access to reimburse it for tax litigation, related expenses and attorneys fees.

151. Based on an adjustment to the book income reported on the Pennsylvania 2000 Stub Return for the period January 1, 2000 through April 7, 2000, the Pennsylvania Department of Revenue assessed additional franchise taxes against Telco for the tax period ending December 31, 2000

in the amount of $163,838. ("Pennsylvania 2000 Year–End Assessment"). (Stip. ¶ 139; Def.'s Ex. 2.)

152. Based on an adjustment to the book income reported on the Pennsylvania 2000 Stub Return for the period January 1, 2000 through April 7, 2000, the Pennsylvania Department of Revenue assessed additional franchise taxes against Telco for the tax period ending December 31, 2001 in the amount of $14,961. (Stip. ¶ 139; Def.'s Ex. 3.)

153. Telco appealed the Pennsylvania 2000 Year–End Assessment and ultimately prevailed by order of the Pennsylvania Board of Finance and Revenue dated July 2, 2004. (Stip. ¶ 141; Def.'s Ex. 4.)

154. Telco appealed the Pennsylvania 2001 Assessment and succeeded in obtaining a settlement from the Pennsylvania Department of Revenue Board of Appeals dated May 24, 20004, which reduced the Pennsylvania 2001 Assessment to $1,248. (Stip. ¶ 142; Def.'s Ex. 5.)

155. Telco incurred attorneys' fees in connection with its appeals from the Pennsylvania 2000 Year End Assessment and the Pennsylvania 2001 Assessment.

156. The proceedings in Pennsylvania concerning these tax assessments against Telco have not yet concluded. (Garrity Tr. at 100.) In addition, Telco has incurred and continues to incur attorneys' fees and expenses in connection with this Adversary proceeding. (Stip. ¶ 144.)

### Telco's Claim to Massachusetts 1999 Tax Refund

157. As earlier noted, Telco returned the Massachusetts 1999 tax refund to World Access. (Findings of Fact ¶¶ 131–134.)

158. Mies is currently World Access' Senior Vice President of Finance. He previously held that title at Telco but resigned on the Closing Date. (Mies Tr. at 78.) Mies signed the Massachusetts 1999 tax return on Telco's behalf on or about September 15, 2000.

159. Garrity is Telco's current Vice President of Finance. He testified that Telco did not receive a signed copy of the Massachusetts 1999.

160. Line 25 of the 1999 Massachusetts tax return states, "Amount overpaid to be credited to 2000 estimated tax: $693,851." A line was drawn through the typed figure $693,851 and that same amount is handwritten on Line 26. Line 26 states "Amount overpaid to be refunded." (Def.'s Ex. 9.)

161. Mies testified that he did not know whether this adjustment was already on the form when he signed it or whether he had made the adjustment himself. He also did not know whether anyone had informed Telco of the adjustment.

162. Garrity testified that he turned over the 1999 tax refund by mistake.

163. The SPA provided for an adjustment based on the Intercompany Balance between World Access and Telco as of the Closing Date. For purposes of this calculation, the Intercompany Balance between World Access and Telco was agreed to be zero as of December 31, 1999. (Pl.'s Ex. 1, § 1.3(a).) Telco alleges that since the Intercompany Balance was zero and the payment was by mistake, therefore World Access had no right to the Massachusetts 1999 Tax Refund. (Def.'s Concl. of Law ¶ 13.)

### Basis for Claims of Setoff and Recoupment

164. The SPA provides that World Access "will indemnify, hold harmless, and reimburse the Buyer and its Affiliates" for certain intellectual property claims indicated on the Disclosure Schedules accompanying the SPA. (Pl.'s Ex. 1, §§ 2.15, 9.1(d); Disclosure Statement § 2.15(2)(b).)

165. Section 2.15(2)(a) of the Disclosure Schedule references correspondence between representatives of Telco and Nortel Networks, Inc. ("Nortel") relating to an on-going patent infringement dispute ("Nortel claim"). (Pl.'s Ex. 1, Disclosure Statement 2.15(2)(a).)

166. Section 2.15(2)(b) of the Disclosure Statement indicates that the Lemelson Medical, Education & Research Foundation, Limited Partnership ("Lemelson Foundation") alleges that Telco infringed on one or more of its patents ("Lemelson claim"). (Pl.'s Ex. 1, 2.15(2)(b).)

167. Telco contends that the SPA requires World Access to reimburse it for litigation and/or expenses pertaining to the Lemelson and Nortel claims. (Garrity Tr. at 103; Def.'s Post–Trial Findings of Fact ¶ 19.)

168. On October 30, 2001 Telco filed a proof of claim in World Access' bankruptcy case. (Pl.'s Ex. 27.)

169. In its proof of claim, Telco contends that the SPA requires World Access to reimburse it for litigation and/or expenses pertaining to the Lemelson and Nortel claims. (Garrity Tr. at 103; Def.'s Post–Trial Findings of Fact ¶ 19; Pl.'s Ex. 27, Proof of Claim, Ex. B.) Telco indicated that the value of the Lemelson claim is unascertainable due to ongoing litigation and the value of the Nortel claim is unascertainable. (Pl.'s Ex. 27, Proof of Claim, Ex. B.)

170. Telco further asserted that the SPA obligates World Access to indemnify and reimburse it for claims, losses, and expenses for tax liability in "Indiana, California and Unknown States." Telco indicated that the value of these claims are unascertainable. (Pl.'s Ex. 26, Proof of Claim, Ex. B.)

171. On October 30, 2001 BATM filed an identical proof of claim. (Pl.'s Ex. 27, Proof of Claim, Ex. B.)

172. On September 21, 2004 an order was entered confirming a plan of liquidation in World Access' bankruptcy case. (Def.'s Ex. 7; Pl.'s Findings of Fact ¶ 16; Def.'s Findings of Fact ¶ 16.) The Plan, effective October 12, 2004, established a Liquidation Realization Trust to liquidate the assets and property of World Access. (Def.'s Ex. 7, §§ 7.3, 7.5, 7.6; Pl.'s Findings of Fact ¶ 16; Def.'s Findings of Fact ¶ 16.)

173. The Plan designated Morton Levine of Levine & Block in Atlanta, Georgia to serve as the initial Realization Trustee. (Def.'s Ex. 7, § 7.1.)

174. On October 19, 2004 an order was entered substituting Morton Levine, as Trustee of the World Access Realization Liquidation Trust, as plaintiff in this Adversary in the place of World Access, Inc. (Realization Trustee's Substitution Order, Oct. 19, 2004.)

175 Statements of fact contained in the Conclusions of Law section shall constitute additional Findings of Fact.

## CONCLUSIONS OF LAW

### Post-confirmation Jurisdiction

 World Access' Chapter 11 plan was confirmed on September 24, 2004. The jurisdictional authority of a bankruptcy judge is reduced following plan confirmation. *See Pettibone Corporation v. Easley,* 935 F.2d 120, 122 (7th Cir.1991) (jurisdiction lacking to consider stay annulment post-confirmation when that did not affect plan implementation). Plan confirmation removes the debtor's property from the estate and revests it back in the debtor. *Lawndale Steel Co., Inc. v. Fairlane Steel, Inc. (In re Lawndale Steel Co., Inc.),* Nos. 90 A 706, 90 A 726, 90 A 737, 1991 WL 242977, at *5, 1991 Bankr.LEXIS 1665, at *14 (Bankr.N.D.Ill. May 2, 1991); *In re Xonics, Inc.,* 813 F.2d 127, 131 (7th Cir.

1987) ("Jurisdiction does not follow the property. It lapses when property leaves the estate . . . Otherwise anyone who could trace his title to a bankrupt could invoke federal jurisdiction to settle disputes affecting that property.")

■ Nonetheless, post-confirmation jurisdiction is clearly retained where the debtor's plan provides for retention of jurisdiction and that retention is necessary for implementation of the plan, and to clarify ambiguities in the plan. *See, e.g.,* *Winston & Strawn v. Kelly (In re Churchfield Management & Inv. Corp.),* 122 B.R. 76 (Bankr.N.D.Ill.1990) (postconfirmation jurisdiction over avoidance and preference claims continues where the plan provides for jurisdiction to be retained.); *Spiers Graff Spiers v. Menako (In re Spiers Graff Spiers),* 190 B.R. 1001, 1007 (Bankr. N.D.Ill.1996) (citing cases); Fed.R.Bank.P. 3020(d).

■ Moreover, bankruptcy courts have core jurisdiction to interpret and enforce their orders. *See Cox v. Zale Delaware, Inc.,* 239 F.3d 910, 917 (7th Cir.2001); *In re Weber,* 25 F.3d 413, 416 (7th Cir.1994) (holding that bankruptcy court's interpretation of its own confirmation order is entitled to the same deference as accorded any court construing its own judgements).

### Core Jurisdiction Lies Under Counts I and II

■ In this case, the confirmed Plan of World Access provided for retention of jurisdiction to hear and determine all motions and adversary proceedings pending on the Plan's Effective Date. This Adversary was pending on the Plan's Effective Date. (Def.'s Ex. 7, § 15.1(xxi).) Core jurisdiction therefore lies over Counts I (turnover of property of the estate) and II (recovery of unauthorized postpetition transfer) under 28 U.S.C. § 157(b)(2)(E) and (H).

### "Related to" Jurisdiction Lies Over Count III with Consent to Final Judgment

■ Count III alleges conversion, a state law claim. Although this claim is based on nonbankruptcy law, "related-to" jurisdiction exists because any recovery would inure to the benefit of the Debtor's creditors. *See Zerand–Bernal Group, Inc. v. Cox,* 23 F.3d 159, 161–162 (7th Cir.1994). However, both parties here consented to entry of final orders and judgment in this forum. (Consent of Plaintiff and Counterclaim Defendant World Access, Inc. to Entry of Final Orders and Judgment by Bankruptcy Judge; Consent of Defendant and Counterclaim Plaintiff Telco Systems, Inc. to Entry of Final Orders and Judgment by the Bankruptcy Judge.) *See Horwitz v. Alloy Automotive Co.,* 992 F.2d 100, 103 (7th Cir.1993) ("a bankruptcy judge lacks jurisdiction over state-law claims unless the parties consent to the adjudication.") "Related-to" jurisdiction therefore lies under 28 U.S.C. § 157(c)(1), but final judgment on Count III may be entered therein.

### DISCUSSION

The parties do not question the accuracy of the tax returns. Nor do the parties allege any error by the state taxing authorities in calculating and disbursing the tax refunds. The issues in dispute are whether the tax refunds were and are property of the bankruptcy estate and if so, whether Telco may retain a portion of those refunds based on doctrines of setoff and recoupment.

### Property of the Estate

■ The filing of a bankruptcy petition creates an estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Congress intended a broad range of property to be included in

property of the estate, *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 205, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), including every conceivable interest of the debtor— future, nonpossessory, contingent, speculative, and derivative—*In re Yonikus,* 996 F.2d 866, 869 (7th Cir.1993) (citing *In re Anderson,* 128 B.R. 850, 853 (D.R.I.1991)) and the products, proceeds and offspring of those interests. 11 U.S.C. § 541(d).

■ Although federal law determines whether a debtor's interest in property is property of the estate, property interests are created and defined by state law. *Butner v. United States,* 440 U.S. 48, 54– 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Even when state law recognizes an interest in property, moreover, section 541(a)(1) places a temporal limit on the interests that become part of the debtor's estate. *Holstein v. Knopfler (In re Holstein),* 321 B.R. 229, 234–35 (Bankr.N.D.Ill.2005).

The bankruptcy estate includes only those legal or equitable interests the debtor has "as of the commencement of the case." 11 U.S.C. § 541(a)(1); *In re Carousel Int'l Corp.,* 89 F.3d 359, 362 (7th Cir.1996); *Yonikus,* 996 F.2d at 869; *Witko v. Menotte (In re Witko),* 374 F.3d 1040 (11th Cir.2004) ("pre-petition causes of action are part of the bankruptcy estate and post-petition causes of action are not")

However, property of the estate may also include prepetition interests acquired by the debtor that bear fruit postpetition. *Segal v. Rochelle,* 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966) (holding that a prepetition interest coming to fruition after commencement of a bankruptcy case may be property of the estate if "sufficiently rooted in the prebankruptcy past.")

■ Plaintiff contends that federal law substantiates Debtor's interests in the tax refunds. He cites a series of cases holding that a tax refund is property of the estate based on federal law. (Pl.'s Post–Trial Concl of Law ¶ 5–7 at 12–13.) But those

cases address federal income tax law. See, for example, *Western Dealer Management Inc. v. England (In re Bob Richards Chrysler–Plymouth Corp.),* 473 F.2d 262, 265 (9th Cir.1973); *Segal,* 382 U.S. at 375, 86 S.Ct. 511; *Kokoszka v. Belford,* 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974); and *U.S.A. v. Revco D.S., Inc. (In re Revco D.S., Inc.),* 111 B.R. 631 (Bankr. N.D.Ohio 1990). Federal law is not applicable here to determining ownership of the refunds in issue. The refunds resulted from tax returns filed with state taxing authorities; the respective laws of those states, not federal law, govern the issue as to who owns the refunds. Plaintiff must therefore establish a prepetition interest in the tax refunds based on applicable state law. *See Groupe v. Hill (In re Hill),* 156 B.R. 998 (Bankr.N.D.Ill.1993) (holding that burden is on the party seeking turnover to prove that an asset is property of the estate.)

### Applicable State Law

The events related to this action were divided between several states. World Access executed the Stock Purchase Agreement ("SPA") in Georgia, which required performance that is relevant here (filing of tax returns and tax payments on Telco's behalf) in those several states. (*See* Findings No. 10.)

While validity of the SPA is not in dispute, both parties seek to enforce their respective rights under that contract.

The SPA contains a choice-of-law provision providing that any dispute under that Agreement will be governed by Delaware law. (Pl.'s Ex. 1, § 10.8(a).) Accordingly, since Telco's setoff and recoupment defenses derive from language in the SPA, Delaware law governs adjudication of those defenses.

World Access contends that ownership of the tax refunds may be decided based

on state law tort doctrines of money had and received and conversion. Those asserted tortious acts are separate and distinct from the SPA. Thus, the SPA's choice of law provision does not apply to those claims. Instead, laws of the states generating refunds as to which the alleged tortious acts occurred (Delaware, Georgia, Massachusetts, New Jersey, and Pennsylvania) potentially govern those claims.

■■■ Neither party has raised a conflict of laws or choice of law issue or objection. Any such issue was therefore waived by virtue of the pre-trial order. *See S.N.A. Nut Co. v. The Haagen–Dazs Co. (In re S.N.A. Nut Co.)*, Nos. 94 B 5993, 00 C 2820, 2000 WL 988528, *5, 2000 U.S. Dist. LEXIS 10430, at *14 (N.D.Ill. July 17, 2000) (affirming bankruptcy judge's dismissal of affirmative defenses because party failed to raise them in compliance with the pre-trial order.); *Calmaquip Eng. West Hemisphere Corp. v. West Coast Carriers*, 650 F.2d 633, 637 (5th Cir.1981) (declining to consider defenses to summary judgment not raised in pleadings, pre-trial order, or memorandum in response to motion for summary judgment).

However, where the parties here did refer to state law in their filings, they both referred to the substantive law of Georgia (where the SPA was signed). In the absence of an articulated choice of law dispute, the adherence by the parties to and arguments under Georgia law will be followed. The substantive law of Georgia will therefore govern all contract issues pleaded by the Complaint. *See Almar Communications v. Telesphere Communications (In re Telesphere Communications)*, 167 B.R. 495, 502 n. 4 (Bankr. N.D.Ill.1994) and *Union Carbide Corp. v. Viskase Corp. (In re Envirodyne Indus.)*, 183 B.R. 812, 826 n. 23 (Bankr.N.D.Ill. 1995) for applications of this principle for selecting choice of law.

### Money Had and Received—Count I

World Access claims interest in the state tax refunds based on the Georgia common law doctrine of money had and received.

■■■ Under Georgia authority, an action for money had and received (formerly known at various times in legal history as indebitatus assumpsit, implied assumpsit, and assumpsit) is founded on the equitable principle that no one ought to be unjustly enriched at the expense of another. *Gulf Life Ins. Co. v. Folsom*, 256 Ga. 400, 349 S.E.2d 368 (1986) (*"Gulf I"*). The doctrine authorizes recovery against one who holds sums of money belonging to another which ought in equity and good conscience be refunded. *Taylor v. Powertel*, 250 Ga.App. 356, 551 S.E.2d 765, 770 (2001); *Rhone v. Bolden*, 270 Ga.App. 712, 608 S.E.2d 22, 32 (2004).

■■■ The equitable principles applicable to money had and received have been codified in part by Georgia statute. *Gulf I*, at 371–372 (explaining that money had and received is governed by the equitable principles set forth in O.C.G.A. §§ 13–1–13, 23–2–32 and 23–2–29.) The equities to be considered are: (1) whether there was any negligence on the plaintiff's part relating to the states refunding overpayments to Telco; (2) the level of good faith (or lack of it) with which the defendant acted in receiving and retaining the money, and (3) prejudice, i.e., whether the defendant's position has so changed that it would be unfair to require it to repay the money. *Gulf Life Ins. Co. v. Folsom*, 907 F.2d 1115, 1119 (11th Cir.1990) (*"Gulf II"*) (interpreting the Georgia Supreme Court's analysis of money had and received.)

■■■ The standard is extremely flexible, and as a panel of the Eleventh Circuit observed, "essentially what this means is that in an action for money had and received, where the plaintiff was negligent,

the plaintiff is entitled to get his money back—unless the [trier of fact] decides that he doesn't deserve it back or that the defendant deserves to keep it." *Gulf Life II*, 907 F.2d at 1119.

■ World Access was not negligent in causing the tax returns to be filed or making the extension and estimated tax payments. Nor was World Access negligent in seeking the recovery of the refunds. World Access did not discover that it had overpaid Telco's tax obligations and that a refund would be forthcoming until well after it made the payments.

After learning about expected refunds, World Access promptly attempted to recover the refunds both before and after they were issued. World Access' accountants were told to discuss the return of any refunds with Telco's tax advisors.

When the refunds had not been received, Debtor's accountants at Ernest & Young ("EY") were instructed to contact the taxing authorities in each state to determine the status of the refunds. Once EY determined that Telco received the refunds, World Access offices immediately contacted Telco's president and Telco's counsel and requested of them return of the funds which actually came from overpayment out of World Access assets.

Telco, on the other hand, was negligent in retaining the refunds. It displayed a remarkable degree of laxity in determining origin of the refunds and whether World Access had a good faith basis to ownership. World Access informed Telco that the refunds were due (except for the Massachusetts 1999 Tax Refund) before the refunds were issued, and asserted ownership rights in the refunds. Garrity, Telco's Senior Vice President of Finance, signed and filed all the tax returns except the 1999 Massachusetts Tax Return (which Mr. Mies signed as an officer of Telco). The tax returns indicate on their face that refunds were due. Rather than hold the funds in trust or return them, Telco pocketed the refunds for its own use.

Lastly, Telco has not suffered any prejudice as a result of receiving the refunds. Telco has simply received money not belonging to it which it will now be obliged to disgorge. *Gulf I*, 349 S.E.2d at 373.

The equities weigh in Plaintiff's favor because World Access was entitled under the Georgia doctrine of money had and received to recover its property consisting of the tax refunds from its overpayments of taxes.

■ Since the tax refunds received and held by Telco were and property of the estate, it is liable to the World Access bankruptcy estate to turnover those refunds under 11 U.S.C. § 542; *Boyer v. Carlton (In re USA Diversified Prods., Inc.)*, 100 F.3d 53, 56–57 (7th Cir.1996) (holding that one who is in possession or control of property of the estate must turn it over to the trustee or become liable to the trustee for its value.)

### Asserted Payment of the Massachusetts 1999 Tax Refund to World Access "by mistake"

■ Telco received a 1999 tax refund from the state of Massachusetts in the amount of $682,495. Telco subsequently returned the refund to World Access. Telco now contends its payment of this refund to World Access was a legal and therefore reversible mistake. (Answ. ¶¶ 28–32; Garrity Tr. at 140.)

Telco points to the following as evidence of the supposed mistake: 1) Telco did not receive a signed copy of the Massachusetts 1999 Tax Refund until after the commencement of this litigation; 2) someone modified the 1999 tax return before filing; and 3) at the time of receipt of the refund, Garrity was new to the tax area at Telco.

(Def.'s Post Trial Findings of Fact ¶¶ 29–36.)

Georgia law defines a legal mistake as "some unintentional act, omission, or error arising from ignorance, surprise, imposition, or misplaced confidence." O.C.G.A. § 23–2–21. Mistakes may be of law or fact. However, the "power to relieve mistakes shall be exercised with caution; to justify it, the evidence shall be clear, unequivocal, and decisive as to the mistake." Id. A mistake will not be remedied "if a party, by reasonable diligence, could have had knowledge of the truth." O.C.G.A. § 23–2–29.

The evidence does not indicate that Telco paid the refund by legally recognized mistake. Garrity testified that he was new to the tax area at Telco when Telco received the refund and initially did not know what the refund was for. (Garrity Tr. at 119.) Garrity then explained that he contacted several individuals familiar with the tax situation at Telco and World Access and formed the belief that this refund was to be credited to Telco's 2000 estimated tax. This testimony is not credible because the refund check on its face provided that it related to the 1999 tax year. (Pl.'s Ex. 28.) Further, Garrity testified that he had a number of conversations with the Massachusetts Department of Revenue to work out tax discrepancies in 2002, but did not contact that Department to clarify the source and nature of this tax refund that he returned, (Garrity Tr. at 124), further indicating that he correctly understood the year it related to.

Further, Garrity, as Telco's V.P. of Finance, should have acquired a copy of the Company's tax returns. That Garrity did not have a signed copy of the pertinent tax return until the start of this Adversary is not fault of the Debtor. Garrity could, and should have requested a copy if he was unclear of what tax year the refund related to. The fact that Garrity was unfamiliar with Telco's tax returns further demonstrates Telco's laxity in this affair.

But most important, Telco has failed to demonstrate that payment of the Massachusetts 1999 Tax Refund by it to World Access was the result of "some unintentional act, omission, or error arising from ignorance, suffuse, imposition, or misplaced confidence." Rather, the payment resulted from a conference between high level financial officers who have since had second thoughts. That does not amount to mistake recognized by law.

Moreover, as shown earlier, the money in issue belonged to World Access. One can hardly make a legal mistake returning by money to another that is entitled to it.

Telco argues that someone modified the Massachusetts 1999 Tax Return before it was filed. But Garrity testified that he had not seen a signed copy of the return until the start of this litigation and admitted that he did not give a detailed review of all the tax returns. Given that Garrity is Telco's Vice President of Finance and bore considerable responsibility for the company's finances, this testimony is not credible, and it claims grave irresponsibility by a responsible officer. In the end, Garrity did not rely on the return that was later changed.

Furthermore, Garrity testified that after the Telco stock transaction with BATM (Findings Nos. 6 and 10), Telco notified the state taxing authorities that it was changing its address from World Access's headquarters to Telco's Delaware address. (Findings of Fact ¶ 145.) Garrity did not indicate when Telco made the change but he did state that all the tax refunds were sent to Telco at its Massachusetts address. But Garrity did not indicate that Telco notified World Access of this change.

### Telco's Setoff Claim

Telco asserts that it should be entitled to setoff or to recoup Telco's tax payments and assessments as well as the Massachusetts 1999 Tax Refund against debts assertedly owed by World Access to it. It asserted claims are for indemnification under terms of the SPA involving contract issues unrelated to the tax refunds. (*See* Findings Nos. 166–172)

■■■■ The Bankruptcy Code does not create a right to setoff, but preserves whatever right exists under applicable nonbankruptcy law. *Citizens Bank of Maryland v. Strumpf,* 516 U.S. 16, 18, 116 S.Ct. 286, 289, 133 L.Ed.2d 258 (1995). Under 11 U.S.C. § 553, however, setoffs for "mutual" debts and claims and prepetition debts and claims are authorized.

### The Mutuality Requirement Has Not Been Satisfied

■■■■ Mutuality requires that the debt in question sought to be offset be owed in the same right and between the same parties standing in the same capacity. *Meyer Med. Physicians Group, Ltd. v. Health Care Serv. Corp. (In re Meyer Med. Physicians Group, Ltd.),* 385 F.3d 1039, 1041 (7th Cir.2004). As a general rule, the concept of capacity requires that the parties each owe something in his or her name, and not as a fiduciary. Lawrence P. King et. al., 5 *Collier on Bankruptcy* ¶ 553.03[3][c] at 553–34 (15th ed. rev.2004).

■■■ Where the liability of one claiming a set-off right arises from a fiduciary duty or is in the nature of a trust, the requisite mutuality of debts and claims does not exist, and such persons may not set-off a debt owing from the debtor against such liability. *See Libby v. Hopkins,* 104 U.S. 303, 26 L.Ed. 769 (1881).

The "rationale of this rule is simply that the liability arising from a fiduciary duty is entirely independent of the debt owing from the bankrupt." The trust is not owing to the bankrupt estate but rather is owned by it. *Fore Improvement Corp. v. Selig,* 278 F.2d 143, 145 (2d Cir.1960); *Bob Richards Chrysler–Plymouth Corp.,* 473 F.2d at 265; *Cohen v. The Savings Building & Loan Co. (In re Bevill, Bresler & Schulman Asset Management Corp.),* 896 F.2d 54 (3d Cir.1990); *see also Lehigh Valley Coal Sales Co. v. Maguire,* 251 F. 581, 582 (7th Cir.1918) ("where a creditor receives money from his debtor, with instructions not to apply it on the debt, but to hold or use it for a specific purpose, the right of set-off does not exist, because the creditor has become, not the debtor of his debtor, but the trustee of a specific trust.")

Courts have held that mutuality is lacking where a parent corporation seeks to setoff a tax refund against debt owed to it by its subsidiary. For example, in *Bob Richards, supra,* the parent corporation filed consolidated tax returns for itself and its subsidiaries. The parent corporation sought to setoff the tax refund attributable to the debtor-subsidiary against the prepetition debt owed to it by the subsidiary. The District Court held that no mutuality of debts existed and setoff could not occur. The Circuit Court opinion, referring to authority cited here, affirmed that ruling.

Similarly, in *U.S.A. v. Revco D.S., Inc. (In re Revco),* 111 B.R. 631 (Bankr. N.D.Ohio 1990), Revco filed consolidated federal tax returns for its subsidiaries, including Defendant General Computer Corporation ("GCC"). Revco subsequently sold all its shares in GCC in 1986. Revco and GCC both claimed ownership in a tax refund earned while GCC was still Revco's subsidiary. Revco sought to offset the amount of the refund against GCC's prepetition debt. The Court in *Revco,* following *Bob Richards,* also held that mutuality was lacking and denied Revco's right to a setoff.

■ The reasoning in *Bob Richards* and *Revco* applies here. Telco seeks to offset the amount of the tax refunds against World Access' alleged prepetition debt arising from claims involving unrelated matters that may rest on its rights under the SPA. But based on the holdings and reasoning of the cited authorities, there is no mutuality and Telco's claim of right to setoff is therefore misplaced.

### Telco's Recoupment Claim

Telco also asserts a right of recoupment based on provisions of the Stock Purchase Agreement requiring World Access to indemnify it for certain tax claims. As noted earlier, the SPA provided that Delaware law governs contract disputes.

■ Recoupment is an equitable remedy which permits the offset of debts when the respective obligations are based on the same transaction or occurrence. *See, e.g., Anes v. Dehart (In re Anes)*, 195 F.3d 177, 182 (3d Cir.1999); *University Med. Ctr. v. Sullivan (In re University Med. Ctr.)*, 973 F.2d 1065, 1081 (3d Cir.1992). It is a nonbankruptcy common law doctrine established through precedent which is not codified in the Bankruptcy Code. *Megafoods Stores, Inc. v. Flagstaff Realty Assoc. (In re Flagstaff Realty Assoc.)*, 60 F.3d 1031 (3d Cir.1995).

Recoupment is different from set-off because recoupment requires that the same transaction be involved in the debts. The rules of law regarding set-off apply as long as the same parties are involved, but the debts may have arisen from completely different transactions. *Lee v. Schweiker*, 739 F.2d 870 (3d Cir.1984). While set-offs are governed and limited by 11 U.S.C. § 553, there is no comparable provision limiting assertion of recoupment rights.

Justification for the recoupment doctrine is that where a creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable. *Lee*, 739 F.2d at 875.

■ Under Delaware law, the recoupment doctrine permits a defendant to assert a defensive claim aimed at reducing the amount of damages recoverable by the plaintiff. *TIFD III–X LLC v. Fruehauf Production Co., L.L.C.*, C.A. No, 20488–NC, 2004 WL 1517135, 2004 Del. Ch. LEXIS 94 (Del. Ch. Ct. June 28, 2004).

■ To prevail on a recoupment claim, a party must show that the recoupment claim arises out of the same transaction or occurrence as the plaintiff's suit; the claim is purely defensive and does not seek an affirmative recovery from the plaintiffs; and both the primary damages claim and the claim in recoupment involve the same litigants. *TIFD*, 2004 WL 1517135 at *4, 2004 Del. Ch. LEXIS 94 at *12 (citing 80 C.J.S. Set-off and Counterclaim § 2 (2000)).

### Not the "Same Transaction"

■ The essential element for recoupment is that the debts arise from the same transaction. *See, e.g. MCI Telecommunications Corp v. Wanzer*, C.A. No. 89C–MR–216, 89C, 1990 WL 91100, at *13–14, 1990 Del.Super. LEXIS 222, at *44–45 (Del.Super. Ct. June 19, 1990).

■ The same transaction requirement is generally met where the relevant claims arise from a single contract. *University Med.*, 973 F.2d at 1080. However the existence of a single contract does not automatically satisfy the necessary transactional nexus. *TIFD*, 2004 WL 1517135, at *8, 2004 Del. Ch. LEXIS 94, at *27. The transactions must have a common factual core and be factually related. *Id.*

In the instant matter, Plaintiff on behalf of World Access seeks ownership of the tax refunds. In contrast, Telco's recoupment claim arises from the SPA. The propriety of World Access' contractual duty, if any, under the SPA is separate from Telco's decision to retain the tax refunds that belong to World Access; the latter did not arise from the SPA.

The SPA, although one contract, gave rise to a series of separate transactions. Separate and factually unrelated transactions gave rise to the refunds: the decisions of the state taxing authorities to credit interest and offset income derived in other years; the use of tax credits, net operating loss carrybacks and carryforwards; and the ability to utilize previous net operating loss deductions. These separate events and transactions did not arise merely from filing of the tax returns. *Cf. Lockheed Sanders, Inc. v. U.S.A.*, 862 F.Supp. 677 (D.N.H.1994) (holding that a claim for a tax refund is a separate transaction for purposes of recoupment under federal law.) The "same transaction" requirement has not been met in this case, and therefore Telco's recoupment claim must be denied. It is relegated to seek recovery on any debts due to it though its pending claim against the estate or as provided for in the confirmed Plan.

### The Tax Refunds are Avoidable Transfers—Count II

Count II seeks to recover the value of the tax refunds from Telco under 11 U.S.C. §§ 549 and 550 as unauthorized post-petition transfers.

The recovery by a trustee of post-petition transfers requires the satisfaction of four elements: (1) a transfer, (2) of property of the estate, (3) made after commencement of the case, and (4) that is not authorized under the Bankruptcy Code or by the bankruptcy court. *Devan v. Phoenix Am. Life Ins. Co. (In re Merry-Go-Round Enters.)*, 400 F.3d 219 (4th Cir.

2005); *Hoagland v. Edward Hines Lumber Co. (In re LWMcK)*, 196 B.R. 421, 423 (Bankr.S.D.Ill.1996).

Telco argues that those provisions are inapplicable, arguing that the tax refunds are not property of the estate. (Def.'s Post–Trial Br. ¶ 19 at 13.) This argument was rejected above.

All the elements under §§ 549 and 550 were established. First, the tax refunds are property of the estate. Second, they were transferred as a result of Telco's actions. The Bankruptcy Code defines transfer as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." 11 U.S.C. § 101. Under this broad definition, Telco's retention and use of the tax refunds for its corporate use constituted a "transfer". *See Feltman v. Menada, Inc. (Suncoast Towers South Assoc.)*, Nos. 98–10537—BKC, AJC, 98–1451–BKC–AJC–A, 1999 WL 549678, at *5, 1999 Bankr.LEXIS 770, at *16–17 (Bankr S.D. Fla. June 17, 1999) (creditors refusal to return property of the estate was held to be a transfer under Section 549). Third, Telco received and retained the tax refunds after commencement of the bankruptcy case. Lastly, the transfers were not unauthorized by the Code or by Court order. Plaintiff may therefore recover the amounts of the tax refunds from Telco under 11 U.S.C. §§ 549 and 550.

### Telco Converted Plaintiff's Property—Count III

Count III alleges that Telco's receipt and use of the tax refunds constituted a conversion.

As earlier noted, both parties rely on Georgia law as applicable to state law issues. Under Georgia law, conversion consists of "an unauthorized assumption and exercise of the right of ownership over

personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation." *DCA Architects v. American Bldg. Consultants*, 203 Ga.App. 598, 417 S.E.2d 386 (1992). An action for conversion may be brought only by one who has title, possession, or a right to possession of the property. *First Bank & Trust Co. v. Insurance Service Ass'n*, 154 Ga.App. 697, 269 S.E.2d 527, 530 (1980).

■ Telco contends that World Access cannot have a valid claim for conversion because World Access was neither the named payee on the tax refund checks nor a holder thereof. (Def.'s Post–Trial Concl of Law ¶ 16 at 12.) This contention is not supported by Georgia law. A payee on a check may be guilty of conversion even if the payee does not have ownership interest in the proceeds. *See Deep Six, Inc. v. Abernathy*, 246 Ga.App. 71, 538 S.E.2d 886 (2000).

Although Telco was payee on the refund checks, it was not entitled to them. The tax refunds are part of World Access' bankruptcy estate and World Access had an immediate right to receipt of the check proceeds. By not surrendering the refunds upon receipt and by spending or using their proceeds, Telco converted World Access' property.

■ Plaintiff argues that if conversion is established, it is entitled to attorneys fees for services in connection with obtaining the refunds. Under Georgia law every intentional tort invokes a species of bad faith and entitles a person so wronged to recover the expenses of litigation including attorney fees. *Hudspeth v. A & H Constr., Inc.*, 230 Ga.App. 70, 495 S.E.2d 322, 324 (1997). Bad faith is a question for the trier of fact, to be determined from consideration of the facts and circumstances in the case. *Id.* at 324. Telco believed the Stock Purchase Agreement gave it a right to retain the funds because of indemnification provisions contained thereon. Although the ruling here goes against that position, Telco's belief and subsequent conduct reasonably based on that position, although wrong, do not rise to the level of bad faith. The fees claimed by Plaintiff are denied.

### CONCLUSION

The refunds all represented overpayments made by World Access on Telco's behalf and Telco has no claim on them by reason of the fortuity that the states sent the refunds to it. It seeks to keep a windfall that belongs to the party responsible for it.

All tax payments belonged to Debtor and may be recovered for the estate, in the total amount of $1,290,585.83. Telco's argument that the foregoing factual history gives it any legal claim of ownership in the tax refunds is misplaced, as was its contention of mistake in paying the 1999 Massachusetts Tax Refund to World Access. Telco's setoff and recoupment defenses was based on an asserted right of indemnification arising out of the SPA, but it also failed to establish those affirmative defenses.

The tax refunds in issue here, totaled $1,973,080.83, consisting of (a) the $701,799 Georgia 2000 Stub Refund, (b) the $75,112 Pennsylvania 2000 Stub Refund, (c) the $511,285.91 Massachusetts 2000 Stub Refund, (d) the $682,495 Massachusetts 1999 Refund, and (e) the $2,388.92 New Jersey 2000 Stub Refund. However, Telco returned the $682,495 Massachusetts 1999 Refund, so only $1,290,585.83 remains due from Defendant to Plaintiff, plus interest as requested.

It should be clear that the Telco claim was not set for trial or resolution in this proceeding, and that claim has not been resolved by this ruling except for the rul-

ing that such claim may not be set off or recouped herein but must be applied against estate assets under the confirmed Plan. Telco is therefore relegated to recovery of any claims under the confirmed Plan.

Judgment will separately enter for the Plaintiff as to Counts I, II, and III of the Amended Complaint.