Terry J. WILKINS, Plaintiff–Appellant,

v.

Donald E. JAKEWAY; Vincent
Lombardi; Roberta Garber,
Defendants–Appellees.

No. 00–4412.

United States Court of Appeals,
Sixth Circuit.

Aug. 15, 2002.

Before GUY and BATCHELDER,
Circuit Judges; WALTER, District

Judge.*

BATCHELDER, Circuit Judge.

Plaintiff Terry J. Wilkins appeals the district court's order granting summary judgment to the defendants in this 42 U.S.C. § 1983 action for retaliatory discharge in violation of the First Amendment. Wilkins argues that the district court erred in failing to follow the law of the case doctrine and in determining that his speech was not protected by the First Amendment. Because we find that the defendants are entitled to qualified immunity we affirm.

## I.

The extensive factual background of this case has been recounted in a number of orders in this and related actions. *See Wilkins v. Jakeway*, 183 F.3d 528, 533 (6th Cir.1999); *Wilkins v. Jakeway*, 78 F.3d 585 (6th Cir.1996) (unpublished). The facts material to this appeal appear in the district court's order from which this appeal is taken, and our review of the record persuades us that the district court's rendition is both accurate and complete. We therefore need only summarize the facts here.

The Office of Community Services (OCS), which is part of the Ohio Department of Development (ODOD), is the Ohio state agency charged with distributing money to local government agencies to assist the poor. Terry Wilkins was the Chief of the OCS until his employment was terminated in February of 1993. Wilkins reported directly to Roberta Garber, the Deputy Director for the Community Development Division of the ODOD; Garber, in turn, reported to Vincent Lombardi, the Assistant Director of the ODOD, who answered to the ODOD's director, Donald Jakeway.

It was the responsibility of the ODOD's audit office to audit the agencies which received funds from the OCS. Beginning around 1990, Wilkins claims that as a result of independent audits, he became concerned with the inability of the ODOD audit office to determine whether the local government agencies were properly using the funds given them by the ODOD. Wilkins began to raise his concerns with his co-workers and superiors and, eventually, with the Ohio Inspector General. For example, Wilkins told Garber (and later the ODOD administration) that the on-site auditors from the audit office

> were coming to me sometimes in tears complaining that their senior auditors on-site would not allow them to document possible misuse of public funds.... I was also informed ... that they were later ridiculed by Melanie Buller [the head of the audit office], told that they found too much, that they had brought back too many questioned costs and that they were going to have to drop a lot of these items.

Wilkins claims that he was silenced by the defendants and told not to discuss any of his claims about the incompetence of the audit office.

Wilkins also sent memos to both the ODOD's chief legal counsel, Tom Washbush, and Assistant Attorney General Alan Klodel, spelling out problems with the Lima–Allen County Community Action Committee ("LACAC"), a county agency that he regarded as grossly mismanaged. Wilkins repeated his earlier claims that the audit office was not uncovering evidence of gross misuse of funds.

---

* The Honorable Donald E. Walter, United States District Judge, Western District of Louisiana, sitting by designation.

Sometime around June of 1992, Jakeway became suspicious about the auditing and funding of the LACAC because previous audits had repeatedly shown that it was not operating properly and no one had stopped the ODOD from continuing to fund it. Since Jakeway was unsure of his ability to interpret correctly what the audits actually revealed, and because if he was correct it was possible that federal funds had been misused, Jakeway gave the audit documents to the Inspector General's office, who then suggested that his office conduct an inquiry. Jakeway assented.

During this time frame, Wilkins—who is African American—met with Anthony Whitmore, the Assistant Deputy Director of Minority Affairs for the ODOD, to discuss his concerns with the ODOD audit office and what he viewed as a cover-up of the short-comings of that office. At Whitmore's request, Kathy McNeal, the ODOD personnel director, met with Wilkins in July of 1992, and during this meeting Wilkins reiterated his concerns. McNeal arranged for a meeting between Wilkins and Jakeway.

Within a few days, Wilkins met with Jakeway's staff and other members of the ODOD's upper management. Wilkins told those at the meeting about the "gross misuse of federal funds" by the county agencies and the failure of the audit department to detect that misuse. As a result of that meeting, the Ohio Inspector General contacted Wilkins and on July 28, 1992, Wilkins went to the Inspector General's office with his concerns. An investigation by the Inspector General followed.

On August 17, 1992, the Inspector General released a report that reviewed the past audits of the finances of the LACAC and noted numerous inefficiencies and errors in the auditing process. The report concluded: "Program Directors did not take appropriate action to insure that cor-

rective action was taken by [the LACAC] to correct significant audit deficiencies identified in D.O.D. audits, beginning in 1987."

After months of continuing conflict with Garber—and to a lesser extent, Lombardi—during which time Wilkins received several written reprimands for, among other things, his confrontational approach and his failure to cooperate in the work of the ODOD, Wilkins was eventually fired on February 10, 1993. The defendants do not dispute that in most respects Wilkins's performance was acceptable. They contend, however, that his belligerent attitude, his refusal to accept direction from his supervisors, his repeated accusations of wrongdoing and his insistence on placing blame rather than working to find solutions for the problems made administration of the ODOD inordinately difficult. The instances to which Wilkins points as evidence of Garber's silencing him, the defendants contend, are in fact examples of Garber's attempting to keep order in the OCS and "move forward" in a positive direction. Garber claimed that the final straw came when she learned that Wilkins had hired an employee from the ODOD audit office—of which Wilkins was so critical—who, as Wilkins knew, was seeking a promotion to a position with the Ohio Industrial Training Program, for which she would—and in fact, shortly after being hired, did—leave her employment with the OCS. The OCS was left with a vacancy that would take considerable time to fill. Garber stated that she then realized that Wilkins was never going to cooperate with the rest of the staff and that he was going to continue to disparage the audit office even though the audit office head had been fired as a result of the Inspector General's report.

At bottom, the defendants contend that Wilkins did not agree with Garber's view

of what his job was and how he should perform it; neither did he agree with Garber's view of how the agency should be run. Garber and Lombardi decided in late January to approach Jakeway and recommend firing Wilkins, to which he agreed.

Wilkins brought this action on December 14, 1993, in the Southern District of Ohio, against Lombardi and Jakeway in both their individual and official capacities, and against Garber in her individual capacity. The complaint, as later amended, contains a 42 U.S.C. § 1983 claim for termination of employment in retaliation for his protected speech concerning the misuse of government money, in violation of the First and Fourteenth Amendments; a claim that Wilkins was terminated in violation of the state whistleblower statute; and a state law claim for intentional infliction of emotional distress.

The defendants filed a motion to dismiss on, *inter alia*, qualified immunity grounds, which the district court denied with respect to the First Amendment retaliation claim and granted as to the pendent state law claims. The defendants brought an interlocutory appeal and this court affirmed the denial. *Wilkins*, 78 F.3d at ——.

On remand the district court granted the defendants' motion for summary judgment, finding that Wilkins's First Amendment claim was precluded by *Wilkins v. Jakeway*, 993 F.Supp. 635 (S.D.Ohio 1998), which dismissed Wilkins's separate False Claims Act action. Wilkins appealed and we affirmed the dismissal as to the official capacity claims but reversed and remanded on the individual capacity claims. *Wilkins*, 183 F.3d at 533. On remand the defendants filed a motion for summary judgment which the district court granted, holding that Wilkins's speech did not address a matter of public concern and

therefore was not protected by the First Amendment. This timely appeal followed.

## II.

■ Wilkins argues that the district court failed to adhere to the law of the case doctrine because this court had previously ruled that Wilkins's speech—asserting that the audit office had failed to take action to prevent the misuse of government money—addressed a matter of public concern. Similarly, Wilkins claims, the district court failed to follow this court's ruling that Wilkins's interest in speaking outweighed the ODOD's interest in an efficient workplace.

The law of the case doctrine provides that "findings made at one point in the litigation become the law of the case for subsequent stages of that same litigation." *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir.1994). The doctrine is similar to that of stare decisis, which is designed to ensure that similarly situated litigants receive similar treatment. The law of the case doctrine seeks to ensure that throughout their case, litigants are treated consistently. The law of the case doctrine is not a mandate but is instead subject to three "extraordinary" exceptions: (1) subsequent to the issuance of the prior decision, substantially different evidence is presented, or (2) a contrary view of the law is issued by a controlling authority; or (3) the prior decision is clearly erroneous or would create a manifest injustice if allowed to stand. *Craft v. United States*, 233 F.3d 358, 363–64 (6th Cir.2000).

We do not find that the district court failed to follow the law of the case. Our earlier ruling affirmed the denial of the defendants' motion to dismiss; we ruled that as a matter of law, the allegations of Wilkins's *complaint* stated a claim for First Amendment retaliation. *Wilkins*, 78 F.3d at —— – ——. In granting the de-

fendants' motion for summary judgment, the matter before us here, the district court held that the *evidence* introduced by Wilkins for purposes of summary judgment failed to raise a material issue of fact as to his retaliation claim and that the evidence did not support Wilkins's claim that his speech concerned matters of public interest.[1] These are two separate issues. *See Soc'y of Roman Catholic Church of the Diocese of Lafayette, Inc. v. Interstate Fire & Cas. Co.,* 126 F.3d 727, 735 (5th Cir.1997) (noting that application of the law of the case doctrine is inappropriate when the relevant issues are governed by different standards of review).

Furthermore, the two-interlocutory-appeal-rule announced in *Behrens v. Pelletier,* 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), is inconsistent with Wilkins's broad reading of the law of the case doctrine. In *Behrens,* the Court's decision to allow interlocutory appeals (in the qualified immunity context) from denials of both a motion to dismiss and a motion for summary judgment rested in part on the ground that "the legally relevant factors bearing upon the *Harlow* question will be different on summary judgment than on an earlier motion to dismiss." *Id.* at 309. In the order before us in this appeal, the district court reviewed the evidence produced by the parties in support of and in opposition to the defendants' motion for summary judgment, whereas, in ruling on the motion to dismiss, the district court had only the contents of the pleadings to consider. This assignment of error is without merit.

## III.

We review the district court's grant of summary judgment de novo. *McCloud v. Testa,* 97 F.3d 1536, 1541 (6th Cir.1996). We view the facts in the light most favorable to the nonmovant. *Jackson v. Leighton,* 168 F.3d 903, 909 (6th Cir.1999). "Summary judgment is proper if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Wolotsky v. Huhn,* 960 F.2d 1331, 1334 (6th Cir.1992).

Qualified immunity protects from liability for civil damages those officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The purpose of qualified immunity, however, is not only to preclude an ultimate finding of liability. Instead, to advance the interests underlying qualified immunity—insuring that government officials are not deterred from efficiently and effectively performing their discretionary duties—qualified immunity is also a shield against the burdens and expenses of litigation itself. *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). "The entitlement is an *immunity from suit* rather than a mere defense to liability." *Id.*

To avoid the bar of qualified immunity a plaintiff must show that his claimed right was clearly established at the time of the alleged violation such that a reasonable officer would have understood that his conduct violated that right. Summarizing the

---

1. Wilkins's argument that the district court failed to follow the law of the case with regard to the balancing of Wilkins's First Amendment interests against the state's interest in operating the ODOD efficiently is somewhat wide of the mark. Because the district court found that Wilkins's speech did not involve matters of public concern, it held that Wilkins's speech was not protected by the First Amendment, and the court therefore did not rest its opinion on the balancing issue.

law which governs the determination of whether a right was clearly established at the time of the alleged violation, we have said:

> The right must be defined at the appropriate level of specificity to determine whether it was clearly established at the time the defendants acted. This means that to be "clearly established" the contours of the right must be sufficiently clear so that a reasonable official would understand that what he is doing violates that right. A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point. " 'This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.' "

*Risbridger v. Connelly,* 275 F.3d 565, 569 (2002) (internal citations omitted). And in *Cope v. Heltsley,* 128 F.3d 452, 458–59 (6th Cir.1997) (citation omitted), we said that courts must:

> examine the asserted right at a relatively high level of specificity. The right must have been "clearly established" not just in an abstract sense, but in a "particularized" sense. Claims of immunity are thus to be analyzed "on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendant['s] position could have believed that his conduct was lawful ...."

The unconstitutionality of an act must be "clear in regard to the official's particular actions in the particular situation." *Long v. Norris,* 929 F.2d 1111, 1114 (6th Cir. 1991), *abrogated on other grounds as recognized in Virgili v. Gilbert,* 272 F.3d 391, 395 (6th Cir.2001).

Wilkins claims that he was discharged because he exercised his First Amendment right to free speech. There is no question that Wilkins had a right not to be discharged because of his speech if that speech was in fact protected by the First Amendment. The issue before us here is whether the speech that Wilkins claims was the reason for his discharge was thus protected, and if it was, whether a reasonable official at the time of Wilkins's discharge would have understood that the speech was protected by the First Amendment. We conclude that even if the district court erred in holding that Wilkins's speech was not protected, it was not clearly established at the time of Wilkins's discharge that the content of his speech was entitled to First Amendment protection.

To be protected by the First Amendment, Wilkins's speech was required to be related to "matters of public concern." *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In 1993, however, there was no case law clearly establishing that speech such as Wilkins's was protected. The parties have pointed us to five cases prior to 1993 that discussed First Amendment retaliation claims. None of these cases would have put the defendants on notice, in 1993, that their actions in discharging Wilkins violated his clearly established rights.

The first case in this circuit to directly discuss speech by a public employee concerning fraud and misuse of government funds was *Marohnic v. Walker,* 800 F.2d 613 (6th Cir.1986). There we found that the plaintiff's assistance in a state investigation of his agency employer's involvement in medicaid fraud related to a matter of public concern and that the agency's retaliation against the plaintiff for his cooperation in the investigation violated the First Amendment. *Id.* at 616. We noted that the plaintiff's motivation for speaking

was not personal but civic, and the speech was not in the context of an employment related dispute but a state investigation with which the plaintiff assisted. *Id.* We observed in that case the importance of the fact that the plaintiff's speech had neither hindered his job performance nor caused disruption in the workplace. *Id.*

In the second such case, *Solomon v. Royal Oak Township,* 842 F.2d 862, 865–66 (6th Cir.1988), the plaintiff was a police officer who told a newspaper reporter that the head of the police department had not prosecuted an individual who had committed a crime—"an obstruction of justice"—and instead had hired that person for his own private investigative service—"for his own personal gain." The reporter published the story. We characterized these published statements as divulging "political corruption," and concluded that they related to matters of public concern and were protected by the First Amendment. And because we found that the statements did not cause conflict or disruption in the department we concluded that in discharging the plaintiff because of his speech, the defendants had violated his First Amendment rights. *Id.* at 866.

In *Barnes v. McDowell,* 848 F.2d 725, 734–35 (6th Cir.1988), we held that an employee's speech concerning the mismanagement of Kentucky's Bureau for the Blind did not charge that his employer was corrupt, and thus did not relate to a matter of public concern but was only about management incompetence.

This court in *Brown v. City of Trenton,* 867 F.2d 318, 322 (6th Cir.1989), ruled that a letter by police officers to their superior voicing grievances over how a unit was run was not addressing a matter of public concern. We found that the plaintiffs' "grievances were essentially those of in-house people dissatisfied with the chief's leadership of their group" and not statements about the public interest motivated by the plaintiffs' public spirit. *Id.*

In the last case, *Thomson v. Scheid,* 977 F.2d 1017, 1019 (6th Cir.1992), the plaintiff's job was to investigate fraud for his agency employer. The plaintiff investigated Scheid who complained to the plaintiff's superior. *Id.* We held that since the plaintiff's speech was made in the course of his job and concerned the procedures he was to follow, his speech was not on a matter of public concern. *Id.* at 1021.

Our review of the case law prior to Wilkins's termination reveals that the defendants could not reasonably have known that by firing Wilkins they were infringing on his constitutional right to free speech. Looking at the "content, form, and context of a given statement, as revealed by the whole record" it is clear that Wilkins's speech did not address a matter of public concern as defined by the case law in 1993. *Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Rather than charging corruption or fraud, most of Wilkins's speech assigned blame for the failures of the audit department and occurred during the performance of his job, where he was speaking as an employee and not as a citizen. Wilkins's speech arose in the context of a personal dispute with Garber over how Wilkins and the agencies within the ODOD were to perform their jobs. We hold that no reasonable official in the position of the defendants in 1993 would have understood that this speech was protected by the First Amendment.

We note as well that no reasonable state official sitting in the defendants' shoes in 1993 would have been able to determine that "the employee's interest in making such statements outweighs the 'interest of the State, as an employer, in promoting the efficiency of the public services it per-

forms through its employees.'" *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 144 (6th Cir.1997). The record reveals no genuine dispute about the fact that Wilkins's speech was very disruptive to the working environment of the ODOD and greatly impeded the ability of the government, as employer, to fulfill its mission.

Accordingly, we find that the defendants are entitled to qualified immunity.

**CONCLUSION**

For the foregoing reasons, we **AFFIRM** the summary judgment in favor of the defendants.