NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0006n.06

**No. 18-1129**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| In re: B & P BAIRD HOLDINGS, INC., | ) | |
| Debtor. | ) | **FILED** |
| | ) | Jan 08, 2019 |
| _____ | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| KELLY M. HAGAN, | ) | |
| Plaintiff, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| | ) | |
| PAMELA A. BAIRD, | ) | |
| Defendant. | ) | |
| | ) | |

BEFORE: CLAY and GRIFFIN, Circuit Judges; ZOUHARY, District Judge.[*]

GRIFFIN, Circuit Judge.

This non-core bankruptcy adversary proceeding stems from the wind-up plan of debtor B & P Baird Holdings, Inc. Debtor entered into an asset purchase agreement in which it sold substantially all of its assets and arranged for the proceeds of the sale to be transferred to a personal bank account owned by defendant Pamela Baird and her now ex-husband, William Baird. Mr. Baird was the controlling shareholder, director, and officer of debtor. After debtor filed for bankruptcy under Chapter 7 with significant outstanding debts, trustee James W. Boyd[1] sued the Bairds to recover those funds, asserting a variety of state and federal causes of action.

---

[*]The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

[1]"The initial Trustee, James W. Boyd, resigned on May 27, 2014, after he was confirmed to serve as a bankruptcy judge for the Western District of Michigan. [Kelly] Hagan was appointed

This appeal concerns two conversion claims brought under Michigan law. The bankruptcy court granted summary judgment in favor of defendant with respect to both claims, and the district court affirmed. On appeal, we reject trustee's first theory of conversion on the merits and hold that her second theory is precluded by the doctrine of judicial estoppel. Because trustee made several arguments earlier in this litigation that contradict those she makes here—arguments that the bankruptcy court accepted when it granted partial summary judgment in her favor on a fraudulent transfer theory—she is precluded from maintaining an inconsistent position now. We therefore affirm the bankruptcy court's order granting summary judgment in favor of defendant. We also affirm the bankruptcy court's denial of trustee's motion for summary judgment.

I.

A.

Debtor, a Michigan corporation, was previously engaged in the business of designing, manufacturing, and selling golf equipment, bags, balls, and accessories. Debtor is closely held, with William Baird ("Mr. Baird" or "Bill") as its principal owner, director, and officer. Defendant ("Ms. Baird" or "Pam"), his now ex-wife, was also involved at various points as a director, officer, and shareholder. In *Hagan v. Baird (In re B & P Baird Holdings, Inc.)*, 591 F. App'x 434, 435–37 (6th Cir. 2015) ("*Baird I*"), this court summarized the preliminary facts of the core bankruptcy and this adversary proceeding as follows:

> **A.      Izzo Sues Debtor**
>
> On January 8, 2002, Izzo Golf, Inc. (Izzo), brought a patent-infringement action against Debtor, a golfing equipment company that was then known as King Par Corporation (Old King Par (OKP)), alleging that OKP's golf bags infringed on Izzo's patents. Izzo's motion for summary judgment was granted in part on July 5, 2007, resulting in OKP's liability to Izzo as well as continuing litigation. *See Izzo*

---

as his successor Trustee. All references to Trustee before May 27, 2014, refer to Boyd." *Hagan v. Baird (In re B & P Baird Holdings, Inc.)*, 591 F. App'x 434, 435 n.1 (6th Cir. 2015).

*Golf, Inc. v. King Par Golf Inc.,* No. 02–CV–6012 CJS, 2010 WL 86653 (W.D.N.Y. Jan. 6, 2010) (summarizing the proceedings).

### B.       Debtor Sells Substantially All Its Assets

On June 4, 2009, after lengthy negotiations and while Izzo's suit was still pending, OKP, Baird Family LLC and Bill entered into an Asset Purchase Agreement (APA) with KP Acquisition Company, LLC ("New King Par" or "NKP") for the sale of all OKP inventory and substantial portions of OKP's land to NKP for $3,400,000, subject to certain adjustments.  The APA further provided that NKP would, for a fee, collect all OKP receivables outstanding as of March 31, 2009, as fiduciary, and use the funds to pay OKP debts accrued as of that date.  Any funds remaining after OKP's debts were paid and NKP took its fees were to be paid to OKP regularly.  OKP retained only what the APA identified as "Excluded Assets" and "Excluded Liabilities." Among the liabilities designated as excluded was liability related to the Izzo litigation.  Thus, under the APA, OKP retained essentially only liabilities and the potential for receivables collected on its behalf by NKP.

At the closing of the sale, NKP wired $4,010,242 to one of the Bairds' joint personal accounts (the "Arvest account") at Bill's direction.  On or about June 9, 2009, OKP changed its name to B & P Baird Holdings, Inc. Bill remained the president, director, and shareholder of the new entity.  The July, August, and September 2009 excess receivables owed to Debtor were used to pay $384,334 on the Bairds' personal tax obligations.  All subsequent monthly receivable collections owed to Debtor were wired to the Bairds' Arvest account.

At the time the APA closed, OKP had liabilities in excess of one million dollars, including a $350,000 obligation to Izzo for the claim for which Izzo was granted summary judgment.  The Bairds made payments totaling at least $263,269.67 to a number of OKP's creditors, not including Izzo, from their personal bank accounts while continuing to incur costs and fees associated with the ongoing patent-infringement litigation.  Izzo obtained a judgment against Debtor for $3,286,476.65, and later successfully petitioned for post-verdict enhanced damages.

### C.       Bankruptcy Filing and Instant Adversary Proceeding

On September 9, 2010, Debtor filed a voluntary Chapter 7 bankruptcy petition, listing Izzo among six unsecured creditors and stating that Debtor's total liability was $3,676,741.95.

On August 23, 2011, Trustee initiated this adversary proceeding against the Bairds and NKP based on the Bairds' designation of the Arvest account for receipt of funds generated by the sale of Debtor's assets.  On January 6, 2012, Trustee requested leave to amend the complaint, which the court granted on January 25, 2012.  The first four counts of Trustee's first amended complaint sought the avoidance and recovery of allegedly fraudulent transfers to the Bairds; Count V alleged that the

Bairds violated the Michigan Business Corporation Act; and Counts VI and VII alleged Michigan common-law and statutory conversion. The conversion claims alleged that the proceeds of sale were diverted to the Bairds as part of a scheme developed and carried out by Pam and Bill, who were in control of Debtor's management and direction, or, alternatively, carried out only by either Pam or Bill.

(Footnotes omitted).

### B.

The Bairds moved to dismiss the conversion claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Bankr. P. 7012(b). The bankruptcy court granted the motion, finding that trustee had not properly pleaded conversion in the complaint. When trustee moved to amend the complaint to cure the deficiency, the bankruptcy court denied leave to do so, finding that trustee's revised theory, while successfully alleging conversion, also implicated the doctrine of *in pari delicto*,[2] which would apply to the conversion claims and make any amendment to the complaint futile. The bankruptcy court denied trustee's motion to alter or amend and the district court affirmed its denial of leave to amend the complaint. *Boyd v. Baird (In re B & P Baird Holdings, Inc.)*, No. 1:13-CV-424, 2013 WL 6858456, at *1, *6 (W.D. Mich. Dec. 30, 2013).

On appeal, we reversed, holding that "[b]ecause [defendant's] role in the conversion of Debtor's assets has not been resolved, it cannot be determined at this stage whether the *in pari delicto doctrine*" applies. *Baird I*, 591 F. App'x at 442–43. For this reason, and because trustee's proposed amended complaint adequately pleaded conversion, we found that "[t]he proposed

---

[2]*Baird I* explained that "Michigan law's wrongful-conduct rule incorporates the common-law *in pari delicto* maxim that as between parties *in pari delicto*, that is equally in the wrong, the law will not lend itself to afford relief to one as against the other, but will leave them as it finds them." 591 F. App'x at 441 (internal quotation marks omitted). The bankruptcy court found that the doctrine "applie[d] in this instance because the person or persons controlling debtor were also the persons or persons who were benefiting from the alleged conversion."

amendment therefore was not futile and the motion to amend should have been granted." *Id.* at 443.

Two significant events transpired in the bankruptcy court while the appeal was pending. First, on August 8, 2012, the bankruptcy court granted trustee's motion for partial summary judgment with respect to Count I of the complaint, finding that the four transfers to the Arvest account were constructively fraudulent because they left debtor "unreasonably undercapitalized" and thus unable to pay its creditors. *See* 11 U.S.C. § 548(a)(1)(B)(ii)(II). Accordingly, the bankruptcy court avoided the transfers pursuant to 11 U.S.C. § 548(a)(1).

Second, the parties then reached a settlement, which was approved by the bankruptcy court and supported by Izzo, debtor's largest creditor. *See Baird I*, 591 F. App'x at 438 nn. 9–10 (citing filings from the core proceeding not in the current record). Pursuant to the agreement, defendant paid $1,875,000 into the bankruptcy estate, while William Baird paid $1,900,000. 591 F. App'x at 438. This settled all claims against all defendants in the adversary proceeding except for the two conversion claims under Michigan law against defendant that were the subject of *Baird I*.

## C.

So, on remand, the resurrected conversion claims against defendant were all that remained of this adversary proceeding. Trustee and defendant each filed competing motions for summary judgment. The bankruptcy court granted defendant's motion and denied trustee's motion. *Hagan v. Baird (In re B & P Baird Holdings, Inc.)*, No. 11–80397, 2015 WL 6152959, at *1 (Bankr. W.D. Mich. Oct. 15, 2015).

The bankruptcy court noted that trustee made "two significant concessions" at oral argument. *Id.* at *4. First, she conceded that she had uncovered "no evidence that [defendant] was involved in structuring or effecting the sale of the Debtor's assets, or the decision to transfer the

Sale Proceeds into the Arvest Account." *Id.* Second, trustee admitted that there was no evidence that either of the Bairds embezzled the sale proceeds. 2015 WL 6152959, at *4. The bankruptcy court then found that debtor consented to the APA, including the wire transfers to the Arvest account, noting that trustee submitted no evidence to the contrary and concluding that "[i]n short, the Trustee asserts that the Debtor *should not* have transferred the funds, not that the Debtor *did not* transfer them." *Id.* at *6. The court also found that debtor "retained no property interest in the funds" after the transfer, citing both the evidence defendant submitted and the court's earlier decision granting partial summary judgment to trustee. *Id.* at *7. Ultimately, the bankruptcy court found that "Trustee cannot establish a crucial element of her conversion case against Pam—that Pam's use of the funds violated the Debtor's property interests." *Id.* at *9. Accordingly, the court granted defendant's motion, denied trustee's motion, and entered judgment in favor of defendant on the conversion claims.

Trustee appealed to the district court, which affirmed the bankruptcy court's decision. *Hagan v. Baird (In re B & P Baird Holdings, Inc.)*, 288 F. Supp. 3d 803, 805 (W.D. Mich. 2018). This appeal followed. Trustee challenges both the grant of defendant's summary judgment motion and the denial of her own, though the lion's share of the briefing on both sides focuses on defendant's motion.

## II.

"When we review appeals from the decisions of a district court in a case originating in bankruptcy court, our standard of review is somewhat different than normal. We directly review the decision of the bankruptcy court rather than the district court's review of the bankruptcy court's decision." *Poss v. Morris (In re Morris)*, 260 F.3d 654, 662 (6th Cir. 2001). "On appeal from a bankruptcy court's decision granting summary judgment, we review the bankruptcy court's factual

findings for clear error and its legal conclusions *de novo*." *MBNA Am. Bank, N.A. v. Meoli (In re Wells)*, 561 F.3d 633, 634 (6th Cir. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* Fed. R. Bankr. R. 7056. If the movant has done so, the non-moving party must "come forward with specific facts showing a genuine issue for trial." *Merriweather v. Zamora*, 569 F.3d 307, 313 (6th Cir. 2009) (internal quotation marks omitted). "When we review a motion for summary judgment, we must view all facts and inferences in the light most favorable to the non-moving party." *Hall v. Spencer Cty., Ky.*, 583 F.3d 930, 933 (6th Cir. 2009). But "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In Michigan, the tort of conversion has bases in both statutory and common law. Trustee asserts both types of conversion claim here. "Under the common law [of Michigan], conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines & Equip., Inc. v. Columbian Distrib. Servs., Inc.*, 871 N.W.2d 136, 141 (Mich. 2015) (internal quotation marks omitted) (quoting *Thoma v. Tracy Motor Sales, Inc.*, 104 N.W.2d 360, 362 (Mich. 1960)). "To support an action for conversion of money, the defendant must have obtained the money without the owner's consent to the creation of a debtor-creditor relationship and must have had an obligation to return the specific money entrusted to his care." *Lawsuit Fin., L.L.C. v. Curry*, 683 N.W.2d 233, 240 (Mich. Ct. App. 2004) (internal quotation marks omitted); *see also People v. Christenson*, 312 N.W.2d 618, 622 (Mich. 1981) (Moody, J., concurring) (collecting Michigan Supreme Court cases). This court has

"emphasize[d] the necessity of a property interest to distinguish it from a contractual obligation, which will not support a conversion claim by itself." *Liggett v. Schwartz (In re Schwartz)*, 622 F. App'x 485, 491 (6th Cir. 2015) (collecting Michigan cases).

Michigan's conversion statute reads as follows:

(1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:

(a) Another person's stealing or embezzling property or converting property to the other person's own use.

(b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

(2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

M.C.L. § 600.2919a. Statutory conversion is narrower than the common law tort in Michigan, as "someone alleging conversion to the defendant's 'own use' under [M.C.L. § 600.2919a(1)(a)] must show that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Aroma Wines*, 104 N.W.2d at 148.

III.

We begin by addressing trustee's first, more straightforward theory that the Bairds converted the funds by transferring them to the Arvest account. Although trustee admitted at oral argument before the bankruptcy court that there was no evidence that defendant was involved in the APA or the wire transfers of the sale proceeds to the Arvest account, as the bankruptcy court pointed out, if Mr. Baird "converted the funds by arranging for their transfer into the Arvest Account in a manner inconsistent with the Debtor's property interest in the funds, [defendant's]

use of the funds, whether innocent or malicious, also amounted to a conversion of the Debtor's funds." 2015 WL 6152959, at *5. Defendant argues that because debtor consented to the wiring of the APA's sale proceeds to the Arvest account, no conversion claim can stem from its execution.

As an initial matter, trustee argues that defendant "attempts to claim that 'obtained the money without the owner's consent to a debtor-creditor relationship' equals 'obtained the money without the owner's consent'" and calls defendant's focus on the latter "a misleading truncation of the applicable legal standard." While proving the absence of a "debtor-creditor relationship" is a specific element under Michigan law to claim conversion of money, it is also true that, more generally, consent is a defense to an action alleging a tort. *Smith v. Calvary Christian Church*, 614 N.W.2d 590, 594 (Mich. 2000); *see also Ritchie-Gamester v. City of Berkley*, 597 N.W.2d 517, 532 n.12 (Mich. 1999) (Brickley, J., concurring). And conversion is an intentional tort in Michigan. *Dep't of Agric. v. Appletree Mktg., L.L.C.*, 779 N.W.2d 237, 247 (Mich. 2010). This is illustrated by the fact that a consensual transfer of money would not meet the definition of conversion, which requires proof of "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines*, 871 N.W.2d at 141 (quoting *Thoma*, 104 N.W.2d at 362). Moreover, courts have repeatedly characterized conversion in Michigan in terms of the property having been "obtained without the owner's consent." *Thomas v. Mussog*, No. 278060, 2008 WL 1991718, at *1 (Mich. Ct. App. May 8, 2008) (per curiam); *see Cuvrell v. Lalone (In re Talla, Inc.)*, 34 B.R. 927, 929 (Bankr. E.D. Mich. 1983) (citing *Felcher v. McMillan*, 61 N.W. 791 (Mich. 1894)); *Curry*, 683 N.W.2d at 240. Accordingly, we will examine whether debtor consented to the wire transfers to the Arvest account.

Under Michigan law, "it is well established that 'corporations can only act through officers and agents.'" *Altobelli v. Hartmann*, 884 N.W.2d 537, 543 (Mich. 2016) (quoting *Att'y Gen. v. Nat'l Cash Register Co.*, 148 N.W. 420 (Mich. 1914)). And generally speaking, "a corporation may sell, lease, exchange, or otherwise dispose of all, or substantially all, of its property and assets." M.C.L. § 450.1753(1); *see* § 450.1751(1). If such a disposition of corporate property and assets is "in the usual and regular course of . . . business," it may be authorized by the board of directors. § 450.1751. If it is not in the usual and regular course of business, a vote of the shareholders is required. § 450.1753. By all accounts, at every point relevant to this case, debtor was a very closely held corporation. The bankruptcy court characterized William Baird "as the principal (if not sole) shareholder, officer, and director."[3] 2015 WL 6152959, at *6.

In the bankruptcy court, defendant submitted two pieces of evidence in support of her argument that debtor consented to the APA and the wire transfers to the Arvest account. First, an "officer's certificate" and an accompanying corporate resolution, both signed by William Baird, state that debtor authorized the APA. Second, the APA itself contained explicit "wire instructions" directing that the proceeds be wired to the Arvest account, listing both Mr. Baird and defendant's names underneath as owners of the account. This evidence shows that Mr. Baird had the corporate power and the intent to enter into the APA on behalf of debtor.

"In a sense, all closely held corporations are the alter egos of their shareholders. After all, a closely held corporation is nothing more than a device for an individual to conduct his affairs as if he were another." *Meoli v. The Huntington Nat'l Bank* (*In re Teleservices Grp., Inc.*), 469 B.R.

---

[3]While there remains some uncertainty in the record as to what defendant's exact role was vis-à-vis debtor when the APA was executed, we find no clear error in the bankruptcy court's factual finding that William Baird had the authority both as the controlling shareholder and a director of debtor to enter into the APA on its behalf.

713, 725 (Bankr. W.D. Mich. 2012); *see Paul v. Univ. Motor Sales Co.*, 278 N.W. 714, 721 (Mich. 1938) ("The abstraction of the corporate entity should never be allowed to bar out and pervert the real and obvious truth."). Even if Mr. Baird was not the sole shareholder, director, and officer of debtor, he was in near complete control of debtor at all times relevant to the APA's execution, certainly to an extent that gave him the authority to sell substantially all of debtor's assets. *See also* M.C.L §§ 450.1751, 450.1753. Trustee has not pointed to any evidence that would contradict this reality. We therefore affirm the bankruptcy court's finding that debtor consented to the APA and the wire transfers to the Arvest account and its grant of summary judgment in favor of defendant with respect to trustee's first theory of conversion.

IV.

Trustee's second theory of conversion alleges that debtor did consent to the transfers of the sale proceeds to the Arvest account, but with the Bairds as fiduciaries. Trustee argues that defendant converted the funds by using them for personal expenses, like purchasing a property in Hawaii and certificates of deposit in her name, because "the funds were intended to remain corporate even if titled to the Bairds." This theory turns on whether debtor retained a property interest in the sale proceeds after their transfer to the Arvest account. If it did, then defendant converted the funds by using them in a manner inconsistent with her duties as a fiduciary and debtor's property rights. If it did not, then no conversion occurred.

A.

Trustee argues that the bankruptcy court erred in holding that it was not bound, pursuant to the law of the case doctrine, by the "earlier unappealed rulings" of the prior bankruptcy judge

assigned to this matter.[4]  Trustee notes that during the pendency of *Baird I*, "Judge Hughes retired, and this case was assigned to Judge Scott W. Dales."  Trustee then identifies Judge Hughes' March 13, 2012 bench opinion dismissing the conversion claims (and several discrete rulings therein) as one that should not have been disturbed by Judge Dales.  Trustee also claims that this court endorsed that opinion, "but for the improper application of *in pari delicto*," in *Baird I*.

Judge Hughes' March 13, 2012 bench opinion granted the Bairds' motion to dismiss both conversion claims pursuant to Federal Rule of Civil Procedure 12(b)(6), ruling that they had not been adequately pleaded.[5]  *See* Fed. R. Bankr. R. 7012(b).  Trustee highlights specific excerpts from that opinion and argues that they constituted the law of the case for purposes of Judge Dales' ruling on defendant's motion for summary judgment with respect to those same claims.  For example, trustee cites the March 13, 2012 ruling for the proposition that "trustee's complaint makes it very clear that [the Bairds] accepted the funds, at the very least, as Old King Par's agents."

Under the law of the case doctrine, "findings made at one point in the litigation become the law of the case for subsequent stages of that same litigation.  The doctrine also bars challenges to a decision made at a previous stage of the litigation which could have been challenged in a prior appeal, but were not."  *Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711, 715 (6th Cir. 2002) (citation omitted).  "This doctrine exists for good reason—it discourages 'perpetual litigation' and promotes finality in proceedings by requiring that parties seek review of a claim in the first appeal."  *Burley v. Gagacki*, 834 F.3d 606, 619 (6th Cir. 2016) (quoting *United States v. McKinley*, 227 F.3d 716,

---

[4]Trustee's brief also mentions res judicata in its Statement of Issues and in a heading, but trustee does not actually argue that res judicata applies here.

[5]Judge Hughes' related ruling denying trustee's motion to amend the complaint on the basis of *in pari delicto* was issued in a separate opinion on June 12, 2012.  That ruling was appealed to this court, while the March 13, 2012 bench opinion was not.  *See Baird I*, 591 F. App'x. at 434.

719 (6th Cir. 2000)). It "is quite rigidly applied to force obedience of an inferior court, but more flexibly in its application to reconsideration by the courts that made the earlier decision." *Gillig v. Advanced Cardiovascular Sys., Inc.*, 67 F.3d 586, 589 (6th Cir. 1995) (quoting 1B James W. Moore, et al., *Moore's Federal Practice* ¶ 0.401 (2d ed. 1994)). So, "the doctrine of the law of the case does not preclude the reconsideration of prejudgment orders, [but] it does cast an air of caution on such an exercise by a judicial officer." *Id.*

This court has specifically commented on the application of the law of the case doctrine in situations "when a case is transferred from one judge to another." *Id.* at 590. Any "pre-transfer rulings constitute the law of the case and should not be lightly disturbed," but "pre-transfer orders 'should not be treated as a special breed.'" *Id.* (quoting Moore, et al., *supra*, ¶ 0.404). Ultimately, judges "have . . . the discretion to determine when to reconsider pre-transfer orders in light of the interests that have been advanced by the doctrine of the law of the case." *Id.* Indeed, this court reviews all lower court applications of the law of the case doctrine for abuse of discretion. *Rouse*, 300 F.3d at 715.

The bankruptcy court held that Judge Hughes' March 13, 2012 bench opinion ruling on a motion to dismiss was not the law of the case and did not control its determination at the summary judgment stage. Noting the different applicable standards at each, Judge Dales explained that "[a]t most, the [March 13, 2012] opinion expressed the plausible *possibilities* that the court was required to accept, at the pleading stage, while resolving a motion under Rule 12(b)(6)," as opposed to the evidentiary proof that is required to obtain a grant of summary judgment.

We have held that the law of the case doctrine does not apply to earlier proceedings where a different legal standard governs:

> Our earlier ruling affirmed the denial of the defendants' motion to dismiss; we ruled that as a matter of law, the allegations of [the plaintiff's] *complaint* stated a claim for First Amendment retaliation. In granting the defendants' motion for summary judgment, the matter before us here, the district court held that the *evidence* introduced by [the plaintiff] for purposes of summary judgment failed to raise a material issue of fact as to his retaliation claim and that the evidence did not support [the plaintiff's] claim that his speech concerned matters of public interest. These are two separate issues.

*Wilkins v. Jakeway*, 44 F. App'x 724, 727–28 (6th Cir. 2002) (citation omitted); *see also Wilkins v. Jakeway*, 183 F.3d 528, 535 (6th Cir. 1999) (affirming in part and reversing and remanding in part the earlier motion to dismiss). Other circuits that have considered the question have held similarly.[6] Trustee's argument fails to recognize this crucial distinction. As for the effect of our decision in *Baird I*, we held that "Trustee properly *alleged* a claim of conversion." 591 F. App'x at 439 (emphasis added). The question of whether trustee has proved that claim—or whether defendant has disproved it—is a separate one entirely, and the March 13, 2012 ruling is not the law of the case for purposes of the motions for summary judgment below. The bankruptcy court did not abuse its discretion in so ruling.

B.

Defendant makes a separate argument that invokes both the law of the case doctrine and judicial estoppel. She asserts that a different ruling by Judge Hughes—the August 8, 2012 bench opinion granting partial summary judgment in favor of trustee—controls here and precludes trustee from arguing that debtor retained a property interest in the APA's sale proceeds after the transfers

---

[6]*See United States v. Johnson*, 616 F.3d 85, 93 (2d Cir. 2010), *abrogated on other grounds by Johnson v. United States*, 135 S. Ct. 2551 (2015); *Soc'y of Roman Catholic Church of the Diocese of Lafayette, Inc. v. Interstate Fire & Cas. Co.*, 126 F.3d 727, 735 (5th Cir. 1997); *see also Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1495 (D.C. Cir. 1988) (holding that where agency reached the same result on remand but applied different standard under newly adopted rules, initial decision was not law of the case so as to require review of that decision on appeal from second decision).

to the Arvest account. Defendant claims that in the context of that motion, trustee adopted a position contrary to the arguments she makes here and obtained a favorable ruling on the basis of those representations.[7]

"The doctrine of judicial estoppel 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 476 (6th Cir. 2010) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). It is an "equitable doctrine that preserves the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment." *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir. 1990). "Judicial estoppel also does not usually apply to shifting legal arguments; it typically applies to shifting factual arguments." *Law Office of John H. Eggertsen P.C. v. Comm'r*, 800 F.3d 758, 766 (6th Cir. 2015). "Judicial estoppel, however, should be applied with caution to 'avoid impinging on the truth-seeking function of the court, because the doctrine precludes a contradictory position without examining the truth of either statement.'" *Eubanks v. CBSK Fin. Grp., Inc.*, 385 F.3d 894, 897 (6th Cir. 2004) (quoting *Teledyne*, 911 F.2d at 1218). This court reviews applications of judicial estoppel de novo. *Mirando v. U.S. Dep't of Treasury*, 766 F.3d 540, 545 & n.1 (6th Cir. 2014).

1.

Defendant asserts that in the earlier motion for partial summary judgment, "the Trustee argued that OKP did not retain a property interest in the Sale Proceeds after the transfer to the Bairds' Arvest Account." Defendant highlights several quotes from trustee's brief in support of

---

[7]Because we resolve this issue on the basis of judicial estoppel, we do not address defendant's law of the case argument.

that motion. For example, trustee argued that "Debtor did not retain any legal rights in the corporate funds appropriated by the Bairds and transferred to their personal accounts elsewhere after the arrival in their joint bank account at Arvest Bank." Judicial estoppel, however, "does not bar a party from contradicting itself, but from contradicting a court's determination that was based on that party's position."[8] *Teledyne*, 911 F.2d at 1217 n.3. Accordingly, the relevant source to examine in determining whether judicial estoppel applies is Judge Hughes' August 8, 2012 ruling on trustee's motion for partial summary judgment.

Trustee's motion concerned Count I of her complaint, which alleged fraudulent transfer under 11 U.S.C. § 548. That statute provides that a trustee may avoid certain pre-bankruptcy petition transfers of a debtor's interest in property if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation," and "was engaged in business or a transaction . . . for which any property remaining with the debtor was an unreasonably small capital." 11 U.S.C. § 548(a)(1)(B). This is one of several flavors of "constructively fraudulent" transfer, as opposed to actual fraudulent transfer under § 548(a)(1)(A). *See* § 548(a)(1)(B)(ii)(I)–(IV). "The [Bankruptcy] Code defines a 'transfer' very broadly," *Meoli v. The Huntington Nat'l Bank*, 848 F.3d 716, 728 n.6 (6th Cir. 2017), and it includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with" property or an interest in property, 11 U.S.C. § 101(54)(D).

Judge Hughes found that it was unreasonable for William Baird to fail to provide, in the APA or anywhere else, for a payment out of debtor's assets for any judgment that might result from the Izzo Golf litigation. That case was still pending at the time and debtor's attorneys

---

[8]For this reason, judicial estoppel is not implicated where a party makes alternative or inconsistent arguments in a pleading. *Teledyne*, 911 F.2d at 1217 n.3 (citing Fed. R. Civ. P. 8(e)(2)).

handling it had estimated about $250,000 of potential exposure. The actual judgment ended up being over ten times that estimate, but Judge Hughes focused on Mr. Baird's forward-looking decision to "opt for a wind-up plan that made no provision whatsoever" to anticipate paying even the smaller estimated amount. Judge Hughes also found that debtor had not received a reasonably equivalent value—or anything, for that matter—in exchange for the transfers to the Arvest account, as the Bairds advanced only "at best, a dubious claim . . . that some, but not all, of these transfers were to reimburse them for prior contributions." For these reasons, Judge Hughes granted summary judgment in favor of trustee as to this claim and avoided the transfers.

Several discrete rulings in this opinion have import on the conversion claims. For example, Judge Hughes held that a transfer of assets did indeed occur. More specifically, the opinion contained the following findings:

> [T]he Asset Purchase Agreement did not contemplate Old King Par being paid anything. Rather, Mr. Baird had arranged for everything that was to be paid under the agreement by New King Par to be wired into a joint account held by Mr. and Ms. Baird individually at Arvest Bank in Tulsa, Oklahoma.

> \*\*\*

> The Court determines that these transfers were all along transfers by Old King Par to the Bairds with New King Par simply acting as Old King Par's agent concerning their collection and distribution.

> \*\*\*

> [T]his Court . . . has difficulty understanding [Mr. Baird's] decision not to leave with Old King Par at least some portion of the $4 million in cash New King Par paid at close instead of having all of it paid into the Arvest Bank account to his and his wife's benefit.

> \*\*\*

> [T]he Bairds continu[ed] to take the $200,000 in additional distributions . . . in October, November, and December of that year as supposed reimbursements or otherwise.

These findings by Judge Hughes mirror the arguments made by trustee in her motion. Trustee explicitly characterized the funds post-transfer as "personal funds" and argued that the Bairds "left

[debtor] with 'no' money from which to pay significant anticipated short term expenses." And Judge Hughes found that debtor was "unreasonably undercapitalized" because the transfers to the Arvest account divested debtor of any property interest in those funds. Thus, trustee prevailed on the partial summary judgment motion by successfully arguing that "Debtor did not retain any legal rights in the corporate funds" after the transfers.

The logic of this ruling is illustrated by *Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528 (6th Cir. 2003), a fraudulent transfer case cited by trustee in support of her motion for partial summary judgment, in which the debtors transferred money to a relative to put it beyond the reach of their creditors. In that case, the relative was liable for fraudulent transfer, even though she, at the debtors' direction, used all the money to pay their creditors. This court discussed the relationship between transfer of complete title of the funds and fraudulent transfer when the defendant argued that there was never an actual conveyance of the money:

> Barbara Hurtado here *was* given legal title to the funds. This was, in fact, the very point of the fraudulent conveyance—in order to insulate the debtors from the money (and thus from their creditors), legal title to the funds had to be turned over entirely to Barbara Hurtado. Through this mechanism, the funds could no longer be considered assets of the debtors . . . . The funds were placed in Hurtado's bank account (which the debtors could not access without going through Hurtado). With that established, Barbara Hurtado had legal authority to do what she liked with the funds; she could have invested the funds in lottery tickets or uranium stocks. . . . The funds placed in her account were presumptively hers under Michigan law . . . .

*Id.* at 535 (citations and internal quotation marks omitted).

In the decision below, the bankruptcy court discussed this case and observed that "the reason the law condemns fraudulent transfers is precisely because they remove from debtors the property that they should be using to pay creditor claims." 2015 WL 6152959, at *7. Elaborating, the court held that "Judge Hughes found that the transfers rendered the Debtor insolvent, with nothing left to pay claims. This is precisely why the court treated the transfer of the Sale Proceeds

to Bill and Pam as constructively fraudulent and why the Trustee succeeded in that part of this lawsuit." *Id.*

2.

Trustee nevertheless argues that judicial estoppel should not apply here because Judge Hughes' August 8, 2012 ruling does not necessarily preclude a conversion claim under her theory. Trustee points to the exceedingly broad definition of "transfer" from 11 U.S.C. § 101(54) and argues that "in succeeding on the motion for summary judgment on constructive fraudulent transfer, the Trustee need not have proven an absolute, unconditional transfer of money." This is beside the point because trustee *did* argue specifically that. While the parties disagree about whether a conversion claim and a constructive fraudulent transfer claim can ever coexist in the same case, we need not decide this broad question, and instead view the claims in light of the factual determinations previously rendered in this case.

Trustee cites several cases in support of her argument that the conversion claims can survive in the face of Judge Hughes' August 8, 2012 ruling. The first, *Levine v. Telco Systems, Inc. (In re World Access, Inc.)*, 324 B.R. 662 (Bankr. N.D. Ill. 2005), concerned the defendant's retention and use of tax refunds that it had received on account of tax overpayments made by the debtor, a former parent company of the defendant. The court found that the transfers of the tax refunds to the defendant were avoidable and unauthorized post-bankruptcy petition transfers under 11 U.S.C. §§ 549 and 550. *Id.* at 687. The court also found that the defendant was liable for conversion of the funds under Georgia law. *Id.* at 687–88. But the avoidable transfer in *Levine* was a post-petition transfer, not a fraudulent transfer under § 548. Section 548(a)(1)(B)(ii)(II) specifically requires that the debtor, at the time of the transfer, be "engaged in business or a transaction, or about to engage in business or a transaction, for which any property *remaining with*

*the debtor* was an unreasonably small capital." (Emphasis added). This subsection, under which the bankruptcy court found fraudulent transfer liability here, specifically requires that the debtor part completely with the transferred property. Otherwise, any property that a debtor retains an interest in would still be within reach of its creditors, as discussed above, and therefore not result in undercapitalization. By contrast, §§ 549 and 550 contain no such requirement. Trustee's reliance on the Bankruptcy Code's broad definition of "transfer" is thus misplaced.

In *Bank One, N.A. v. Cullen*, No. 04-CV-72118-DT, 2005 WL 3465722, at *1 (E.D. Mich. Dec. 19, 2005), the court found that the defendant was liable for both conversion and fraudulent transfer, but each claim was grounded in a different interest in property. The conversion claims were based on the plaintiff's security interests in another corporation's contracts and accounts receivable while the fraudulent transfer claim concerned the actual assets of that corporation that were transferred to the defendant. *Id.* at *6. In this case, the fraudulent transfer and conversion claims are based in the same property: the sale proceeds from the APA. For this reason, *Cullen* is inapposite.

The other cases trustee cites are similarly unavailing. *See Dietz v. John Mitchell, Inc. (In re Dietz)*, 94 B.R. 637 (B.A.P. 9th Cir. 1988), *abrogated by Schafer v. Las Vegas Hilton Corp. (In re Video Depot, Ltd.)*, 127 F.3d 1195, 1196 (9th Cir. 1997); *Liebersohn v. Zisholtz (In re Martin's Aquarium, Inc.)*, 225 B.R. 868, 873 & n.1 (Bankr. E.D. Pa. 1998) (observing, in dicta, that the "Debtor's acts in appropriating MAI's service business to their own use would certainly appear to satisfy th[e] definition" of conversion).

3.

Trustee argues that judicial estoppel is unwarranted for several other reasons. First, trustee asserts that Judge Hughes' opinion contained "assurances that the Trustee's remaining claims

(other than conversion which he had dismissed on *in pari delicto* grounds) were still viable." But trustee mischaracterizes the opinion. Judge Hughes explicitly stated that "this Court at this time is deciding only liability under Count I of the second amended complaint, which is trustee's constructive fraud count under Section 548," and noted immediately thereafter that the other claims remained, as they were not the subject of the motion upon which he was ruling. A mere mention of the limits of a ruling's scope does not amount to any assurance that the other claims not referenced are valid. *See, e.g.*, *United States v. Singleton*, 759 F.2d 176, 185 (D.C. Cir. 1985) (Swygert, J., dissenting) ("[T]he decision of the . . . court has no effect on matters not ruled upon." (quoting Allan D. Vestal, *Law of the Case: Single-Suit Preclusion*, 1967 Utah L. Rev. 1, 5)).

Trustee also points out the fact that the parties specifically excepted the two conversion claims from their settlement and concludes that this shows a lack of "cynical gamesmanship" on her part with respect to the underlying purpose of judicial estoppel. An agreement not to settle is quite different from an agreement that a claim is viable or correct, however, and defendant did not waive any of her rights to challenge trustee's claims by simply failing to settle them. The settlement agreement—essentially a contract between the parties—did not vacate the bankruptcy court's prior ruling, either. *See Factor King, LLC v. Block Builders, LLC*, 318 F.R.D. 585, 586 (M.D. La. 2016) (rejecting the parties' joint motion to accept their settlement agreement and vacate the existing judgment, and noting that "the parties' independent settlement agreement cannot dictate the Court's actions"); *see also U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25–26 (1994). And it does nothing to remedy the inconsistency between the arguments made by trustee at different stages of this litigation.

Finally, trustee argues that judicial estoppel should not apply because "[t]here was no sworn testimony of the Trustee," and judicial estoppel requires that the prior contrary position be

taken "under oath in a prior proceeding." *See Griffith v. Wal-Mart Stores, Inc.*, 135 F.3d 376, 380 (6th Cir. 1998). This overly technical argument fails here, in the context of an equitable doctrine that is "not reducible to any general formulation of principle" and for which "there are no inflexible or exhaustive prerequisites for determining [its] applicability." *Valentine-Johnson v. Roche*, 386 F.3d 800, 812 (6th Cir. 2004) (citing *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282 (11th Cir. 2002)). Arguments and submissions made to a bankruptcy court may not be "under oath" in a testimonial sense, but the attorney or pro se party who signs, files, or submits them "is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that "the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Bankr. P. 9011(b). Moreover, enforcing judicial estoppel here effectuates the underlying purpose of the doctrine: "preserv[ing] the integrity of the courts by preventing a party from . . . achieving success on one position, then arguing the opposite to suit an exigency of the moment." *Teledyne*, 911 F.2d at 1218. We reject trustee's miscellaneous arguments and apply judicial estoppel to bar her second theory of conversion. Accordingly, we affirm the bankruptcy court's grant of summary judgment in favor of defendant.

V.

Trustee also appeals the bankruptcy court's denial of her motion for summary judgment. Her arguments are similar to those addressing the grant of summary judgment in favor of defendant, relying heavily on Judge Hughes' March 13, 2012 ruling and the law of the case

argument we have already rejected.  We reject trustee's arguments here for the reasons discussed above.

VI.

We affirm the decision of the bankruptcy court.